# STATE v. WILLIAM HANEY.[1]

June 7, 1946.

No. 34,183.

[1]Reported in 23 N. W. (2d) 369.

*H. N. Jenson* and *A. O. Sletvold,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, and *Lowell W. Benshoof,* Acting County Attorney, for the State.

LORING, CHIEF JUSTICE.

This case is here for the second time. Our opinion on the first appeal is reported in State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315. On the first trial, defendant was found guilty of the crime of carnal knowledge, and an order denying a new trial was reversed because of prejudicial error in the admission of evidence.

On the second trial, defendant was again found guilty. A motion for a new trial on the ground of insufficiency of the evidence, improper conduct of counsel, and the admission of certain evidence as prejudicial error was denied, and defendant again appeals.

■ Although the circumstances under which the crime is alleged to have been committed make it seem extremely improbable that such an offense would be attempted at such a time and place, the record presents a clear question of fact as to defendant's guilt. Were there no errors prejudicial to defendant, we would affirm.

■ An accused, whether guilty or innocent, is entitled to a fair trial, and it is the duty of the court and of prosecuting counsel as well to see that he gets one. There must be no conduct, either by argument or by the asking of irrelevant questions, the effect of which is to inflame the prejudices or excite the passions of the jury against the accused.

In the case at bar, defendant asserts that the closing argument of the prosecuting attorney was permeated with characterizations and innuendoes, the effect of which was to inflame the prejudices of the jury against him and produce a verdict based on passion or prejudice rather than on reason and fair judgment. With that contention we are forced to agree. A reading of the entire argument is necessary to a full appreciation of these objectionable features. Throughout the argument the appeal to prejudice predominates over

the appeal to reason. For instance, the prosecuting attorney depicted defendant's sexual propensities in part as follows:

"* * * His mind was so inflamed, as I think you can reasonably conclude from the evidence here, by his physical and sexual desires that he didn't care who it was or where it was, and he didn't care whether the girl was 14 years old, 18 years old, or how old she was, and he didn't care whether it was his wife or whether it was not, whether it was in the daytime or at night, or whether it was in a place where somebody would catch him or not. He wanted what he wanted when he wanted it and he got it regardless of who he was damaging, regardless of the fact that when he committed the crime he was taking away from that little girl the most precious thing that a girl or woman has. That made no difference to him as long as he was satisfying his physical desires. Make no mistake about that."

While the evidence would clearly support a conviction and that defendant was enamored of the girl involved, there was no evidence that he was affected with unbridled sexual passion. This argument went far beyond any reasonable deduction from the record.

The prosecuting attorney commented as follows upon the presence of defendant's wife in the courtroom. (Early in the trial she had been directed not to sit at the counsel table but to retire into the audience.)

"* * * She isn't a party to the action. She has been here, of course, for the sole purpose of appealing to your sympathy, hoping against hope that you will disregard your oath, let sympathy enter into your deliberations and return a verdict of not guilty. That, of course, was the only purpose of her sitting here."

Later on he referred again to Mrs. Haney's presence and the reason he had stated for it.

"* * * You saw Mrs. Haney sitting around here for the reasons that I have called your attention to. According to the testimony * * * she went over and had dinner at Ione Lindsay's that morn-

ing at a different time than her husband. If this charge isn't true, then why didn't his wife take the witness stand and testify about it. She was there and she would have been a material witness. Let me ask you, if any one of you had been a defendant in this sort of an action and your wife had been around there and knew about it wouldn't it be natural to ask why didn't she take the witness stand? Why didn't she? The other people did. The other people who were there that morning took the witness stand, but Mrs. William J. Haney didn't. Think that one over and let counsel explain that away if he can."

Defendant had made no denial that his wife was absent from the cafe (the locus of the offense charged) at the time the offense was alleged to have been committed. There was no occasion whatever for drawing inferences from the fact that she did not testify. She had a right to be present at the trial under the constitutional provision that defendant should have a public trial.

As to the matter of reasonable doubt, the prosecuting attorney stated:

"Reasonable doubt! How could there be such a thing with an eyewitness to the act.

\* \* \* \* \*

"\* \* \* Think of it, Ladies and Gentlemen! Reasonable doubt! Presumption of innocence! Why those questions, which are legal rules, of course, have gone out of the window in this case some time ago, quite some time ago too."

He did not hesitate to give his opinion as to the credibility of the witnesses and the weight of the evidence. He said:

"\* \* \* As to the question of reasonable doubt, the evidence in my opinion is so overwhelming that it points only in one direction.

\* \* \* \* \*

"\* \* \* As far as the guilt of the defendant is concerned, with the testimony built up around him brick by brick, there can't be any doubt about it, and he can't get around it. He can squirm, stam-

mer, stutter and back and fill all he wants to but it is still there and can't be denied."

And as to the credibility of the testimony of the girl involved in the offense, he contended that rather than falsify—

"* * * Why, she would have cut off her right arm first, and you and I know that she would."

In commenting about pictures of the girl with whom the offense is alleged to have been committed, which were in defendant's possession, he projected his personality into the case and said:

"* * * I don't have colored pictures of girls laying around my office or around my house, colored pictures of my neighbor's children, neither do you. * * * I will repeat what I told you before, that I don't have pictures like that around and I don't have my picture taken with little girls around the neighborhood, neither do you. Neither would this defendant have done so if the facts were not as the state claims they are in this matter."

In discussing the testimony of a schoolteacher who had been called solely to testify as to the reputation for truth and veracity of the girl involved, he said:

"* * * How silly! She didn't know anything about the case. She wasn't down there on the ninth day of July, 1944. It had nothing to do with the case whatsoever. All it indicates is that Haney isn't satisfied with debauching the girl and putting her through the torture and suffering she has gone through, taking her to the top of the Big Rock Candy Mountain and then shoving it out from under her, but he has to drag somebody out of the woods to say that when she was in school she heard that her reputation for truth and veracity was not good. I have nothing but contempt for that sort of business. If they had some direct evidence from somebody who amounted to something or who knew something about the matter I would say fair enough, take it into consideration, but business of that kind I have nothing but contempt for—inferences and innuendoes, that is all it is. Just think for a moment how

ridiculous it is to expect you intelligent men and women to disregard the testimony of all—the testimony of the eyewitness and people around the cafe that morning and go clear out in the woods and bring somebody in here and expect you to listen to the story and believe it, the story of Mrs. J. H. Lundberg. Isn't that silly? Isn't it?"

While the sequence of the argument is hard to follow, apparently, he was leading the jury to believe, among other things, that specific instances of falsehood were admissible and necessary to impeach the girl. At least, the argument might be so interpreted by the jury.

He called upon the jury to support the sheriff and the county attorney in their attempt at law enforcement, as follows:

"Remember this, the sheriff and county attorney of this county are only a part of your law enforcement machinery. We can attempt to do our duty as we have done it in this case, but in the last analysis it is up to you. There is no two ways about that. The sheriff and I can arrest somebody and bring the evidence into court if it is evidence that points to the guilt of the defendant beyond a reasonable doubt as it does in this case, *but if you let the defendant go* * * * *your law enforcement machinery is broken down* and the sheriff and I can't do anything about it because we have to depend upon you to do your duty, and I know you will just as you expect the sheriff and I to do our duty, and we have tried to do it in this instance." (Italics supplied.)

Had exceptions been taken to these arguments, there would be no question as to the necessity of reversing the order denying a new trial. It is obvious that the prosecuting officer was moved by a strong conviction that defendant was guilty of a heinous offense and that he could not restrain his indignation. Without doubt, the prejudicial argument was due to an excess of zeal rather than a determination to take unjust advantage of the accused. Nevertheless, the prejudice to defendant's rights was manifest, and the question arises as to whether, in the absence of exceptions, the trial

court of its own motion should have intervened to protect defendant's rights. That is the crucial question. We think that it should have done so. The argument went so far in language calculated to inflame the prejudices of the jury that it was the duty of the court to intervene *sua sponte*. Aetna L. Ins. Co. v. Kelley (8 Cir.) (1934) 70 F. (2d) 589, 594, 93 A. L. R. 471, 480; State v. Boice, 157 Minn. 374, 377, 196 N. W. 483, 484; Brown v. Walter (2 Cir.) (1933) 62 F. (2d) 798, 799. As the United States Supreme Court said in Berger v. United States, 295 U. S. 78, 85, 88, 55 S. Ct. 629, 633, 79 L. ed. 1314, 1320, 1321, after concluding that the argument of the district attorney had been—

"* * * undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury.

*    *    *    *    *

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

In State v. Clark, 114 Minn. 342, 344, 131 N. W. 369, 370, the same thought was expressed in the following language:

"* * * The duties and obligations of a prosecuting officer are not simply those of an attorney in a civil action; for behind him, and largely at his command, are all the forces of organized society. He has by virtue of his office, if worthy of it, great influence with juries, and he should never forget that he is the representative of the sovereignty and justice of the state, and that he must bear himself, in the discharge of his official duties, as a minister of justice, and never as a partisan. He is not bound to make his argument to the jury colorless, or argue both sides of the case, if the defendant is represented by counsel; but he may present forcibly the state's side of the case. He is, however, never justified in *thrusting his personality into the case,* and *expressing his opinion that the defendant is guilty,* or stating as a fact anything except what the evidence tends to prove, or which he in good faith expects to prove. If he does otherwise, he is guilty of misconduct." (Italics supplied.)

In State v. Boice, 157 Minn. 374, 378, 196 N. W. 483, 484, this court said:

"It has been suggested that in criminal cases the state may not appeal, that a verdict for the defendant is final, and, since his counsel has the closing argument, he may travel out of the record and appeal to passion and prejudice at will, and that to compel counsel for the state to observe the rule is to handicap the state to the decided advantage of the defendant. The answer to this is that trial judges have ample power to keep counsel on both sides within bounds. *The court may and should interfere without waiting for an objection.* We think there is no reason to apprehend that trial judges will not control counsel who wilfully violate rules regulating the scope of legitimate argument." (Italics supplied.)

In State v. Bernstein, 148 Minn. 301, 307, 181 N. W. 947, 949, we said:

"We find nothing in the record to justify the intemperate language persistently used by the prosecuting attorney in this case.

He traveled far afield *when he virtually testified that he knew that Crumley told the jury a deliberate falsehood* and charged him and Dawson with protecting and welcoming bank robbers with outstretched arms, and with coming from Ramsey to Hennepin county to commit perjury to aid a criminal in escaping punishment justly due him. It was improper to make the threat that Crumley and Dawson should not go unpunished for their perjury nor hunt cover in St. Paul without consequence. If we were to sanction the making of such statements, there would be no limits within which attorneys would be confined in summing up before the jury. There could not well be a more extreme illustration of improper argument than we have here. Can it be said that the substantial rights of the defendant were not prejudiced thereby?" (Italics supplied.)

See, also, United States v. Johnson (3 Cir.) (1942) 129 F. (2d) 954, 144 A. L. R. 182, affirmed, 318 U. S. 189, 63 S. Ct. 549, 87 L. ed. 704; State v. Palmer, 206 Minn. 185, 288 N. W. 160.

■ In reference to certain pictures of nude women which were seen by the girl involved when in defendant's house some days *after* the offense was alleged to have been committed, the record shows that the girl was asked by the prosecution:

"* * * whether or not you saw any pictures—

"A. Yes; I did.

* * * * *

"Q. And how did you happen to see those pictures?

"A. Mr. Haney had them there all of the time in the back room that they didn't use, and in his bedroom also."

The court inquired whether the jurors had heard that question.

"Q. Now, * * * calling your attention to the pictures again, I don't think I got your answer. How did you happen to see the pictures there?

"A. Well, they were especially noticeable because they were of nude women."

Defendant's counsel objected on the basis of the reply being immaterial and prejudicial. The court ordered part of the answer reread.

Defendant's counsel again objected on the same basis. The court ruled that whether the answer would be received depended upon what foundation was laid.

"The Court: Read that part of the answer, * * *.

"(Answer read. Well, they were especially noticeable because they were of nude women.)

"The Court: That answer may be stricken. There was a part of her former answer that I didn't get. When was it that he called her attention to those pictures?

"Mr. Benshoof: Would you answer that? Was that after the ninth day of July [the date of the alleged offense] * * *?

"A. Yes.

"Q. How long afterwards was it * * *?

"A. Very soon. The next week end.

*  *  *  *  *

"Mr. Jenson: Move the answer of the witness and the testimony relative to the pictures be stricken out.

"The Court: That part has already been stricken out.

"Mr. Benshoof: Now, you tell us what took place the next week end with respect to those pictures when he called your attention to them."

The objection of defendant's counsel was overruled. The court said, "It may have some bearing." To this ruling of the court counsel objected. The question was reread.

"A. He asked me what I thought of them and I told him to take them down because I didn't like them, and he would not do that because he thought they were pretty nice pictures.

"Q. And what kind of pictures were they?

"Mr. Jenson: Objected to as incompetent, irrelevant and immaterial, having no bearing upon the issues here and offered simply for the purpose of prejudice."

The objection was sustained.

The striking of the answer could not cure the prejudice implanted in the minds of the jury. It had been reread at the request of the

court. Naturally, the jury could not forget the prejudicial information that it contained. Notwithstanding the fact that the answer characterizing the pictures as those of nude women had been stricken, the prosecuting attorney apparently sought to bring out the character of the pictures again in order to further impress the prejudicial information on the jury. Asking the question was almost as effective for that purpose as if the stricken answer had been repeated. The jury knew what the answer would have been if it had been allowed. This episode was prejudicial.

■ The assignment of error that the county attorney in his questioning of defendant and in his closing argument referred to the possibility of a divorce between defendant and his wife is not well taken, because this subject was introduced by defense counsel in cross-examination of the girl involved.

We regret that it becomes necessary after a second conviction to send the case back for another trial. Both verdicts were supported by sufficient evidence, but the prejudice to defendant compels a reversal.

Order reversed.

MR. JUSTICE CHRISTIANSON took no part in the consideration or decision of this case.