NATIONAL AUDUBON SOCIETY, et al, Appellants,

v.

MINNESOTA POLLUTION CONTROL AGENCY, Respondent,

and

Potlach Corporation, defendant-intervenor, Respondent.

No. C5–97–391.

Court of Appeals of Minnesota.

Sept. 23, 1997.

Brian B. O'Neil, Richard A. Duncan, Lisa A. Misher, Faegre & Benson, L.L.P., Minneapolis, for appellants.

Hubert H. Humphrey III, State Attorney General, Eldon G. Kaul, Mehmet Konar–Steenberg, Lisa R. Tiegel, Assistant Attorney Generals, St. Paul, for respondent Minnesota Pollution Control Agency.

G. Robert Johnson, Thaddeus R. Lightfoot, Oppenheimer, Wolf, & Donnelly, Minneapolis, for respondent Potlach Corporation.

Vanya Hogen–Kind, Bluedog, Olson, & Small, Bloomington, for amicus curiae White Earth Land Recovery Project.

Considered and decided by LANSING, P.J., and RANDALL and HARTEN, JJ.

## OPINION

RANDALL, Judge.

Appellants challenge the district court's order dismissing their claim brought pursuant to the Minnesota Environmental Rights Act (MERA) for failure to state a claim on which relief may be granted. Appellants also challenge the district court's grant of summary judgment for respondents, in which the court held that the Minnesota Pollution Control Agency (MPCA) did not act arbitrarily or capriciously in its decision not to require an environmental impact statement, arguing the administrative record was sanitized by the MPCA. We affirm.

## FACTS

Since 1983, the Potlach Corporation has operated an oriented strand board (OSB) plant in St. Louis County, about five miles south of Cook. On June 21, 1995, Potlatch sought approval from the MPCA to expand its OSB plant. The proposed expansion would increase wood consumption at the plant from 178,000 cords per year to 355,000 cords per year, doubling the plant's manufacturing capacity. This increase in consumption would result in the loss of approximately 7,600 acres of mature forest per year. Potlatch estimates that 90% of the wood for the proposed expansion will be harvested within the four counties surrounding the Cook facility: Itasca, Koochiching, Lake, and St. Louis counties.

The environmental review process for the Potlatch expansion officially commenced when Potlatch submitted an application to the MPCA for an amendment to its air emission permit for the plant. The MPCA was designated as the responsible governmental unit (RGU) charged with evaluating the project's environmental impact. Pursuant to the Minnesota Environmental Policy Act (MEPA), the MPCA prepared a mandatory Environmental Assessment Worksheet (EAW) for the project. The EAW focused primarily on the impact to air quality and timber harvesting. The EAW's discussion on the impact of increased timber harvesting was based on the findings contained in the Generic Environmental Impact Statement Study on Timber Harvesting and Forest Management in Minnesota (GEIS), a 1994 study of the cumulative effects of timber harvesting on a statewide basis. The GEIS evaluated the potential impact of timber harvesting under three scenarios: a base level of 4 million cords per year; a medium level of 4.9 million cords per year; and a high level of 7 million cords per year. The increased timber harvest resulting from the Potlatch expansion falls just under the medium harvest level studied in the GEIS.

Because the MPCA has no expertise in forestry and wildlife management, it delegated its responsibility for evaluating the impact of increased timber harvesting to the Minnesota Department of Natural Resources (DNR). The DNR was divided on the issue of whether to recommend preparation of an Environmental Impact Statement (EIS) for the Potlatch expansion. Within the DNR, the Division of Forestry supported the increased timber harvesting and recommended a finding of no significant impact. The Division of Fish and Wildlife determined that the increased timber harvesting had the potential for significant environmental effects and recommended preparation of an EIS. Ultimately, the Commissioner of the DNR agreed with the Division of Forestry and recommended a negative EIS determination.

On July 28, 1995, the MPCA distributed the finished EAW to the public for comment. During the public comment period the MPCA received 27 comments from private citizens, environmental groups, and governmental agencies. Following the public comment period, the MPCA determined that the proposed expansion did not have the potential for significant environmental effects and recommended that no EIS was needed. On November 28, 1995, the MPCA Citizen's Board, the governing body of the MPCA, voted to adopt the staff's recommendation to approve the Potlatch expansion without the

preparation of an EIS. On December 15, 1995, the MPCA approved Potlatch's application for a modified air permit.

On December 22, 1995, in a four-count complaint, appellants brought suit against the MPCA in St. Louis County District Court, challenging the MPCA's decision not to prepare an EIS. Appellants sought an order enjoining the MPCA from issuing any permits associated with the proposed expansion and invalidating any extant permits until an EIS is completed in compliance with MEPA, Minn.Stat. ch. 116D (1996), and MERA, Minn.Stat. ch. 116B (1996). Counts I through III were brought pursuant to MEPA and Count IV was brought pursuant to MERA.

On May 17, 1996, the MPCA moved to dismiss Counts II, III, and IV for failure to state a claim on which relief could be granted. On September 5, 1996, the district court dismissed the three counts. The parties then brought cross-motions for summary judgment on Count I of appellants' complaint. Following a hearing, the district court granted summary judgment in the MPCA's favor, holding that the MPCA did not act arbitrarily or capriciously in its decision not to prepare an EIS. Appellants challenge the district court's dismissal of Count IV of appellants' complaint, and the court's grant of summary judgment in respondents' favor on Count I of the complaint.

## ISSUE

1. Is the MPCA's decision arbitrary and capricious because it failed to include adverse scientific and commenting agency opinion in the administrative record?

2. Was the MPCA's determination that the Potlatch expansion did not have the potential for significant environmental effects under Minn.Stat. § 116D.04, subd. 2a (1996), arbitrary and capricious and not based on substantial evidence in the record?

3. Is a negative EIS determination subject to review in the district court pursuant to Minn.Stat. ch. 116B (1996) (MERA)?

## ANALYSIS

 When reviewing the district court's summary judgment affirming a responsible governmental agency's (RGU) negative declaration regarding the need for an EIS, this court reviews the agency decision to determine if it is " 'unreasonable, arbitrary or capricious, with review focused on the legal sufficiency of and factual basis for the reasons given.' " *Iron Rangers for Responsible Ridge Action v. Iron Range Resources*, 531 N.W.2d 874, 880 (Minn.App.1995), *review denied* (Minn. July 28, 1995); (quoting *Swanson v. City of Bloomington*, 421 N.W.2d 307, 313 (Minn.1988)). An agency's decision is arbitrary and capricious if it represents the agency's will and not its judgment. *Trout Unlimited, Inc. v. Minnesota Dep't of Agric.*, 528 N.W.2d 903, 907 (Minn.App.1995), *review denied* (Minn. Apr. 27, 1995). "A decision will be deemed arbitrary and capricious if the agency relied on factors which the legislature had not intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). This court reviews the administrative record to determine if there is substantial evidence supporting the agency finding. *Iron Rangers*, 531 N.W.2d at 880. Substantial evidence is defined as:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;

2. More than a scintilla of evidence;

3. More than some evidence;

4. More than any evidence; and

5. Evidence considered in its entirety.

*Cable Communications Bd. v. Nor–West Cable Communications Partnership*, 356 N.W.2d 658, 668 (Minn.1984) (citation omitted).

### I.

Appellants assert that the MPCA's decision is arbitrary and capricious because it

omitted responsible scientific opinion from the administrative record by excluding "all adverse DNR opinion from the administrative record." In support of its motion for summary judgment, appellants submitted a number of internal DNR documents they obtained pursuant to the Government Data Practices Act, Minn.Stat. ch. 13 (1996), evidencing the division within the DNR regarding the Potlatch expansion. These documents were not made part of the administrative record. Appellants argue that the MPCA had an obligation to inform the MPCA Citizen's Board that the DNR was deeply divided on the issue of whether to recommend the preparation of an EIS.

■ A RGU's decision on the need for an EIS must be based on "the environmental assessment worksheet and the comments received during the comment period." Minn. Stat. § 116D.04, subd. 2a(b) (1996); *Trout Unlimited*, 528 N.W.2d at 907. This includes documents, however labeled, that are "available and in the possession" of the RGU. *Trout Unlimited*, 528 N.W.2d at 908. Accordingly, pursuant to Minn.Stat. § 116D.04, subd. 2a(b), the MPCA was required to base its decision on the administrative record. *See White v. Minnesota Dep't of Natural Resources*, 567 N.W.2d 724, 734 (Minn.App. 1997) (holding that under plain language of MEPA, reviewing agency must base decision to prepare EAW on administrative record).

■ Evidence not contained in the administrative record and submitted for the first time to the district court may be considered for limited purposes only. *Id.* This is because:

> Permitting a reviewing court to consider evidence outside the administrative record when reviewing an agency decision that must be based on the administrative record raises the possibility that the court will second-guess the agency on the basis of the additional evidence.

*Id.* Thus, a court may consider evidence outside the administrative record only when: (1) the agency's failure to explain its action frustrates judicial review; (2) additional evidence is necessary to explain technical terms or complex subject matter involved in the agency action; (3) the agency failed to consider information relevant to making its decision; or (4) plaintiffs make a showing that the agency acted in bad faith. *Id.* at 735. If the extra-record evidence demonstrates that the agency's effort was clearly inadequate or that the agency failed to set forth widely shared scientific views, "the court's proper function is to remand to the agency for correction of the agency's errors." *Id.* (citing *Reserve Mining Co. v. Minnesota Pollution Control Agency*, 267 N.W.2d 720, 723 (Minn.1978)).

■ As the district court found, there is no evidence that the MPCA excluded adverse DNR or responsible scientific opinion from the administrative record. The MPCA sought the assistance of the DNR and relied on the official opinion of the DNR submitted during the public comment period. We acknowledge the fact that the DNR was deeply divided on the issue of whether to recommend the preparation of an EIS, but it is difficult to say, as a matter of law, that the MPCA had an obligation to seek out and include every pro-EIS and every anti-EIS opinion within the DNR. An administrative agency is not required to look beyond the official comment issued by another commenting agency. To hold otherwise would require a reviewing agency to interject itself, we think improperly, into the internal debate of the commenting agency.

■ A reviewing agency also is not required to consider or include in the administrative record documents never submitted to or received by it. Here, the administrative record includes everything received by the MPCA during the public comment period, including comments not favorable to the Potlatch expansion. Appellants, along with the Minnesota Center for Environmental Advocacy and the Minnesota chapter of the Wildlife Society, submitted extensive and detailed comments, challenging the completeness of the EAW, the use of the GEIS in the EAW, the environmental impacts associated with the Potlatch expansion, and the adequacy of the GEIS's mitigation measures. Even the official comment of the DNR raised issues regarding the validity of the GEIS modeling

assumptions, but noted that no better modeling assumptions are currently available.

■ An EAW is a brief document "designed to set out the basic facts necessary to determine whether an EIS is required for a proposed project." Minn. R. 4410.0200, subpt. 24 (1995). While appellants have presented extra-record evidence that a deep division existed within DNR, they have failed to present evidence that the MPCA failed in its obligation to prepare an EAW designed to set out the basic facts necessary to determine whether an EIS is required. *See White,* 567 N.W.2d at 735 (holding that summary judgment is appropriate where plaintiffs failed to establish reviewing agency avoided issue it should have addressed or by ignoring evidence on issue that was addressed). There is no evidence in this case that the MPCA acted in bad faith or that it failed to consider information relevant to making its decision.

## II.

An EIS is required "[w]here there is potential for significant environmental effects." Minn.Stat. § 166D.04, subd. 2a. In determining whether a project has the potential for significant environmental effects, the agency must consider four factors:

 A. type, extent, and reversibility of environmental effects;

 B. cumulative potential effects of related or anticipated future projects;

 C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority; and

 D. the extent to which the environmental effects can be anticipated and controlled as a result of other environmental studies undertaken by public agencies or the project proposer, or of EIS's previously prepared on similar projects.

Minn. R. 4410.1700, subpt. 7 (1995).

Appellants argue that the mitigation measures recommended in the GEIS do not justify a finding of no significant environmental impact because these measures are "wholly speculative" and beyond the scope of the MPCA's ability to influence or implement.

In preparing the EAW, the MPCA relied on the information contained in the GEIS.[1] Based on the GEIS, the EAW prepared by the MPCA targeted ten areas of potential environmental impact associated with the Potlatch expansion. It then outlined the specific mitigation measures recommended in the GEIS and those undertaken by Potlatch, and evaluated the status of those measures. The EAW reported that many of the mitigation strategies recommended in the GEIS have been or are currently being implemented, and that many of the practices followed by Potlatch have reduced any adverse environmental impacts caused by Potlach's operations.

Contrary to appellants' assertions, the mitigation measures outlined in the EAW are not " 'mere vague statements of good intentions.' " *See Iron Rangers,* 531 N.W.2d at 881 (quoting *Audubon Soc'y v. Dailey,* 977 F.2d 428, 436 (8th Cir.1992)). The EAW targets specific mitigation measures that have been or will soon be implemented that address the environmental impacts associated with the Potlatch expansion. Thus, while the Potlatch expansion will have some significant environmental impact, the EAW and GEIS provide and target specific mitigation measures to reduce the impact of any adverse effects.

Appellants claim that the MPCA improperly relied on the GEIS to evade project-specific review. In this case, it is questionable whether a project-specific EIS would provide information substantially different from or better than that contained in the GEIS. The GEIS was requested by the Environmental Quality Board because the effects of timber harvesting within the state could not be adequately analyzed on a case-by-case, project-specific basis. This is, in part, because it is

---

1. The EAW noted that while the Potlatch expansion was not included in the list of possible forest industry expansions considered during the preparation of the GEIS's medium harvest level, several of the expansions that were being considered at that time are no longer being considered. The MPCA considered it appropriate to use the GEIS because the Potlatch ·expansion replaced those projects no longer being considered.

not possible to identify the specific areas or stands of timber that will be harvested and because the ownership of Minnesota's available timberland is divided among a wide variety of groups and individuals. According to the GEIS, private individuals and corporations other than the forest industry own approximately 43% of Minnesota timberland; the state owns 21%; counties 17%; the federal government 12.3%; and the forest industry owns 5% of Minnesota's available timberland. The harvest of any timber stand depends on the discretion of the specific landowner. Consequently, there does not appear to be any meaningful way to identify the specific 7,600 acres of timberland likely to be harvested from the 6,297,000 acres available for commercial timber harvesting in the four-county Potlatch wood procurement zone.

■ In the present case, the MPCA's reliance on the specific mitigation measures set forth in the GEIS to reduce the environmental impacts of the Potlatch expansion was not unreasonable or impermissible. The administrative record substantially supports the MPCA's negative declaration on the need for a project-specific EIS and is not arbitrary and capricious.

### III.

Finally, appellants argue the district court erred when it dismissed Count IV of their complaint for failure to state a claim on which relief may be granted.

In Count IV of the complaint, appellants sought to challenge the MPCA's decision not to order an EIS pursuant to Minn.Stat. § 116B.03, subd. 1 (1996) (MERA). This section provides that "any person" may bring suit in district court for declaratory or equitable relief against any person "for the protection of the air, water, land, or other natural resources located within the state * * * from pollution, impairment, or destruction." Minn.Stat. § 116B.03, subd. 1. A person is defined as "any natural person" or "any state, municipality, or other governmental or political subdivision or other public agency * * *." Minn.Stat. § 116B.02, subd. 2 (1996).

■ Environmental review is a process of information gathering and analysis. *See Coon Creek Watershed Dist. v. State Envtl. Quality Bd.*, 315 N.W.2d 604, 605 (Minn. 1982) (noting that an EIS is an informational document, examining the environmental consequences of an action and exploring alternatives and any measures that will mitigate any potential adverse effects). Under MERA, "pollution, impairment, or destruction" is defined as "any conduct by any person which violates, or is likely to violate, any environmental quality standard, limitation, rule, order, license, stipulation agreement, or permit of the state" or "is likely to materially adversely affect the environment." Minn.Stat. § 116B.02, subd. 5 (1996). Because environmental review cannot result in pollution, impairment, or destruction of the environment, we conclude environmental review does not constitute "pollution, impairment, or destruction" of the environment as defined by MERA. Appellants therefore have no cause of action against the MPCA under MERA.

In addition, MEPA expressly provides for judicial review of an agency's decision on the need for an EIS. Minn.Stat. § 116D.04, subd. 10 (1996) explicitly states that:

> [d]ecisions on the need for an * * * environmental impact statement * * * may be reviewed by a declaratory judgment action in the district court of the county wherein the proposed action * * * would be undertaken.

Thus, MEPA, unlike. MERA, expressly provides a cause of action to challenge an agency's EIS determination.

This court's recent decision in *White*, decided after oral argument in this case, gives guidance. In *White*, the DNR sought to finish construction of the last 40 miles of the Northshore Trail from Grand Marais to the Canadian border. Plaintiffs brought suit, challenging the DNR's decision not to prepare an EIS. A panel of this court held that any person within the state may bring a civil action under MERA against a state agency or instrumentality to protect natural resources located within the state even if environmental review of the project at issue was already conducted under MEPA. *White*, 567 N.W.2d at 737–38. Because the DNR in that

case was responsible for the trail's construction, this court affirmed the district court's decision to allow plaintiffs to challenge the agency's conduct pursuant to MERA.

 Here, unlike the DNR in *White*, the MPCA's role is limited to conducting the required environmental review of the project. It otherwise has no hand in the Potlatch expansion. As the *White* court held, MERA may not be used to seek review of an agency's decision not to prepare an EIS, because MEPA is the appropriate avenue for review of such decisions. *Id.* (holding that "[u]nlike the MEPA action, the MERA action does not seek review of an agency decision"). Here, appellants are challenging an agency decision. Accordingly, appellants challenge must be brought pursuant to MEPA.

Because MEPA, unlike MERA, provides an express cause of action to challenge agency decisions regarding the need for an EIS, the district court did not err in concluding that appellants' improperly challenged the MPCA's negative EIS declaration under MERA.

### DECISION

We affirm the trial court's grant of summary judgment in respondents' favor. Appellants failed to present evidence that the MPCA acted in bad faith or that it failed to consider information relevant to making its decision. The MPCA's negative declaration on the need for a project-specific EIS is supported by substantial evidence in the record and is not arbitrary and capricious.

The agency decision, on these facts, regarding the need for an EIS may not be challenged pursuant to MERA because MEPA is the exclusive means to challenge such decisions where the agency's role is limited only to environmental review of the project at issue.

**Affirmed.**