STATE of Minnesota, Respondent,

v.

Darryl Andre HARRIS, Appellant.

No. C4–01–1487.

Supreme Court of Minnesota.

Aug. 21, 2003.

Lawrence W. Pry, Asst. State Public Defender, Minneapolis, for Appellant.

Mike Hatch, Attorney General, James B. Early, Asst. Attorney General, St. Paul, Alan Mitchell, St. Louis County Attorney, Duluth, Respondent.

## OPINION

MEYER, Justice.

A St. Louis County jury convicted appellant Darryl Andre Harris of first-degree felony murder and attempted first-degree murder. A judicial officer presided, without objection, over most of the pretrial proceedings, as well as all aspects of the trial, including sentencing. On appeal, Harris argues that his convictions must be reversed and a new trial ordered because the judicial officer did not have jurisdiction to hear and try cases of first-degree murder. We reverse the convictions, holding that the assignment of a felony-level trial to a judicial officer pursuant to Minn.Stat. § 487.08, subd. 5 (2002), is unconstitutional. Harris is entitled to a new trial.

On February 22, 2000, Harris, John Horton, and Lucas Johnson went to the apartment of David Voegeli and Licolle Behan for a drug transaction. At the apartment were Voegeli, Behan, David Greenwood, and Efftimia Mylonas. According to witnesses, Harris entered the apartment, pulled out a gun, and declared that it was a robbery. He instructed everyone to drop to the floor and empty their pockets. A struggle over the gun ensued and at least two shots were fired, one paralyzing Voegeli and the other fatally wounding Greenwood. According to Harris, Voegeli, Greenwood, Horton, and Johnson attacked Harris after he walked into the apartment, and Harris shot Voegeli and Greenwood in self-defense.

A grand jury indicted Harris for first-degree felony murder, second-degree intentional murder, second-degree unintentional murder, attempted first-degree felony murder, attempted second-degree intentional murder, and first-degree assault. The case was assigned to a judicial officer rather than a district court judge. Neither party objected to the assignment, and the judicial officer presided over most of the pretrial proceedings, as well as the entire trial. The jury found Harris guilty on all charges. The judicial officer sentenced Harris to life in prison for first-degree murder and to a consecutive term of 180 months for attempted first-degree murder.

■ On appeal, Harris contends that he is entitled to a new trial before a judge of the district court because the judicial officer lacked jurisdiction to hear and try the case. The state contends that Harris waived any objection to assignment of his case to a judicial officer and, in any event, it was not plain error for the chief judge of the district to assign the judicial officer to hear and try the case. Because the issue of a judicial officer's authority to preside over a felony trial involves purely legal questions, we review the issue de novo. *See State v. Wolf,* 605 N.W.2d 381, 386 (Minn.2000). Before considering a judicial officer's proper jurisdiction, we review the background of the judicial officer position within Minnesota's court system.

### A. *A History of Judicial Officers in Minnesota*

In 1971, the legislature abolished most municipal courts in favor of county courts and authorized the appointment of judicial officers by county courts. Act of June 7, 1971, ch. 951, 1971 Minn. Laws 1985, 1985–

2011 (codified at Minn.Stat. §§ 487.01–487.41 (1971)); *see generally* Marlene Johnson & John M. Stuart, *Minnesota's Judicial Officers: A Short History of an Endangered Species,* Bench & Bar of Minn., Dec. 1979, at 23, 27–28 (explaining the work of judicial officers and how the position was created). Minnesota Statutes § 487.08 (1971) provided:

> When the judicial business of a county court requires, the county court may appoint one or more part time judicial officers who shall be learned in the law and whose salary shall be fixed by the county court, with the approval of the county board or boards of the counties of the district, and paid by the county. They shall serve at the pleasure of the county court. They shall hear and try such matters as shall be assigned to them by the county court judge.

The judicial officer's work was seen as a continuation of the services provided by the municipal court, and the positions were created both to handle excess work load and provide short-term employment for probate and municipal judges who did not become county court judges. Johnson & Stuart, *supra,* at 27–28.

Under the 1971 legislation, a county court judge's jurisdiction was limited to probate matters, juvenile matters, family court proceedings, civil cases where the amount in controversy did not exceed $5,000, quiet title and mortgage foreclosures, forcible entry and unlawful detainer actions, ordinance violations, minor criminal offenses, and preliminary hearings for any criminal matter occurring in the county.[1] Act of June 7, 1971, ch. 951, §§ 14–19, 1971 Minn. Laws 1985, 1992–94. Because county courts did not have jurisdiction over felony matters, a judicial officer appointed under Minn.Stat. § 487.08 could not preside over a felony matter. *See id.*

In 1977, the legislature abolished the office of judicial officer. Act of June 2, 1977, ch. 432, § 25, 1977 Minn. Laws 1147, 1161. Before the effective date of abolition, however, the 1978 legislature amended the statute to grandfather in existing personnel, authorizing persons holding the office of judicial officer on January 1, 1978, in certain counties to "continue to serve at the pleasure of the chief judge of the district under the terms and conditions of their appointments." Act of April 5, 1978, ch. 750, § 3, 1978 Minn. Laws 907, 908–09 (codified at Minn.Stat. § 487.08 (1978)). The 1978 act also brought judicial officers under the controlling authority of the chief judge of the judicial district by providing that their salaries would be fixed by the chief judge, that they would be subject to the administrative authority and assignment powers of the chief judge, and that they would hear and try such matters as the chief judge may assign. Minn.Stat. § 487.08, subd. 5 (1978).[2] The 1978 act would have gradually phased out judicial

---

1. In 1973, the legislature authorized county courts to appoint full-time judicial officers. Act of May 24, 1973, ch. 679, § 5, 1973 Minn. Laws 1817, 1823.

2. The 1978 act provided: "All judicial officers are subject to the administrative authority and assignment power of the chief judge of the district as provided in section 484.69, subdivision 3." Act of April 5, 1978, ch. 750, § 3, 1978 Minn. Laws 907, 909. The referenced section provided in part:

> The chief judge [of each judicial district] may assign any judge of any court within the judicial district to hear any matter in any court of the judicial district. When a judge of a court is assigned to another court he is vested with the powers of a judge of the court to which he is assigned.

Minn.Stat. § 484.69, subd. 3 (1978).

officers through retirement, resignation, or termination of the assignment, but did allow for the appointment of temporary judicial officers for terms to expire no later than July 31, 1981. Act of April 5, 1978, ch. 750, § 6, 1978 Minn. Laws 907, 910.

As part of the same act, the legislature mandated that the supreme court, or an agency designated by it, review and study, among other things, whether the offices of judicial officer and referee should be retained or abolished; and if it was recommended that these offices should be retained, whether the powers and duties should be modified. *Id.*, § 8, 1978 Minn. Laws at 910. On October 1, 1980, the Minnesota Supreme Court Judicial Planning Committee submitted its report to the legislature. Minn. Supreme Court Judicial Planning Comm., Report on the Use of Para-Judicial Personnel in the Minnesota Courts (Oct. 1, 1980) (hereinafter "Committee Report").

The committee recommended that "[n]o vacancy in the office of judicial officer should be filled, nor new office created." *Id.* at 13. The committee noted that following the transfer of assignment powers to the chief judge of the district court in 1978, district court cases were being assigned to judicial officers. *Id.* at 12–13. The committee stated:

> Statutory authority for judicial officers to hear, try, and issue final orders on any matter assigned, together with current assignment practices in the various districts, leads to the conclusion that judicial officers are utilized as functional equivalents of judges.

*Id.* at 12. In recommending the elimination of the judicial officer position, the committee was concerned that "judicial officers are not judges yet they are engaged in judging." *Id.* The committee further explained:

> The Minnesota Constitution and fundamental organization of the judiciary contemplate courts staffed with duly elected judges, accountable to the public. * * * Simply stated, the argument is that "people have a right to a judge."

*Id.* The committee acknowledged that the judicial officer position provided additional judicial personnel to meet rising caseloads, but advised that "[c]aseload requirements should be accommodated not by counties appointing judicial officers, but by the Legislature creating judgeships." *Id.* at 13. The committee also noted that elimination of the judicial officer position would be consistent with recent legislation intended to consolidate, unify, and standardize the court system throughout the state. *Id.* Accordingly, the committee recommended that the office of judicial officer be abolished when all "grandfathered" positions were vacated or terminated. *Id.*

Notwithstanding the committee's recommendations, the legislature did not entirely eliminate the position of judicial officer nor did it modify the duties and powers of judicial officers. Following the Committee Report, the 1981 legislature updated the grandfather provision, providing that persons holding the office of judicial officer on January 1, 1981, in certain counties "may continue to serve at the pleasure of the chief judge of the district under the terms and conditions of their appointment." Act of June 6, 1981, 1st Spec. Sess., ch. 4 art. 3, § 5, 1981 Minn. Laws 2479, 2526 (codified at Minn.Stat. § 487.08, subd. 2 (1982)). Although the same act prescribed the duties and powers of referees, *see id.* at § 4 (codified at Minn.Stat. § 484.70, subd. 7 (1982)), the legislature did not further address the duties and powers of judicial officers.

The 1982 legislature preserved judicial officer positions in St. Louis, Steele, and Carlton counties, granting authority to the chief judge in those districts to fill any vacancies arising in the office of judicial officer so long as the position existed on January 1, 1981. Act of March 23, 1982, ch. 608, § 2, 1982 Minn. Laws 1457, 1457 (codified at Minn.Stat. § 487.08, subd. 2 (1982)). As of May 1992, the only judicial officer position that remained filled in Minnesota was in St. Louis County. Minn. R.Crim. P. 4 cmt.

### B. The Judicial Officer's Jurisdiction

With this background, we come to our first question. Did the legislature intend to grant authority in the chief judge of a judicial district to assign any district court matter to a judicial officer? The purpose of statutory interpretation is to determine the intent of the legislature. Minn.Stat. § 645.16 (2002); *State v. Larivee*, 656 N.W.2d 226, 229 (Minn.2003).

Harris contends that the judicial officer never had jurisdiction to hear and try his case because the legislature never intended to expand the judicial officer's jurisdiction from minor criminal cases heard by the county courts to felony level cases under the jurisdiction of the district courts. Harris asserts that a judicial officer is limited to hearing and trying county court matters under the plain meaning of Minn.Stat. § 487.08 (2002), which states that judicial officers—until their positions are abolished—are to "continue to serve at the pleasure of the chief judge of the district under the terms and conditions of their appointment." Harris argues that permitting judicial officers to serve "under the terms and conditions of their appointment" refers to their original appointment in county court, and they are permitted to

serve so long as they are assigned county court cases. *See* Minn.Stat. § 487.08, subd. 2 (2002). Alternatively, "terms and conditions" could merely refer to administrative matters such as compensation and benefits and not concern a judicial officer's jurisdiction.

We conclude that the "terms and conditions" language likely refers to administrative matters and does not express legislative intent about jurisdiction. If the legislature had intended to limit the jurisdiction of judicial officers, it could have included language to that effect. Indeed, the section on referees, enacted as part of the same act, also states that persons holding the office of referee in certain districts "may continue to serve at the pleasure of the chief judge of the district under the terms and conditions of their appointment," yet contains explicit restrictions on the authority of referees to hear certain contested trials. Act of April 5, 1978, ch. 750, § 2, 1978 Minn. Laws 907, 908 (codified at Minn.Stat. § 484.70, subd. 1 (2002)). Because referees were allowed to continue to serve "under the terms and conditions of their appointment" with limitations on their authority being expressly stated, we conclude that the legislature did not intend "terms and conditions" to define a referee's jurisdictional limits. *In re Butler*, 552 N.W.2d 226, 231 (Minn. 1996) ("where words of a law are not explicit, the intent of the legislature may be ascertained by considering other laws upon the same or similar subjects"). Similarly, we conclude that the legislature did not intend "terms and conditions" to define a judicial officer's jurisdictional limits.

█ Furthermore, Minn.Stat. § 487.08, subd. 5 (2002), subjects judicial officers to the authority of the chief judge of the judicial district:

All judicial officers are subject to the administrative authority and assignment power of the chief judge of the district as provided in section 484.69, subdivision 3. They shall be learned in the law, and shall hear and try matters as assigned to them by the chief judge.

Under section 484.69, the chief judge of each district has the administrative authority to assign any judge any matter in any court of the judicial district. Minn.Stat. § 484.69, subd. 3 (2002). The state contends that the chief judge's authority to assign matters to judicial officers is without limitation; if the legislature had intended to limit judicial officers to the kinds of cases they formerly heard in county court, the legislature would have said so explicitly. We agree. By the end of 1980, the legislature was made aware of the general jurisdiction of the district courts and that judicial officers were being utilized as the functional equivalent of judges. *See* Committee Report, *supra*, at 12. Had the legislature intended to modify the duties and powers of judicial officers, it would have done so explicitly, as it did for referees. *See* Act of June 6, 1981, 1st Spec. Sess., ch. 4 art. 3, § 4, 1981 Minn. Laws 2479, 2526; *see Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 274 (Minn.1995) (declining to read into statute restrictions that the legislature did not include). We therefore conclude the legislature intended to permit the chief judge of the district court to assign any district court or county court matter to a judicial officer under Minn.Stat. §§ 487.08 and 484.69.

*C. Constitutional Limits on Jurisdiction*

We arrive at our next question. Does granting authority to the chief judge of a district to assign any district court matter to a judicial officer, including a felony jury trial, violate the Minnesota Constitution? In construing articles of the constitution, we have stated:

"The rules governing the courts in construing articles of the State Constitution are well settled. The primary purpose of the courts is to ascertain and give effect to the intention of the Legislature and people in adopting the article in question. If the language used is unambiguous, it must be taken as it reads, and in that case there is no room for construction. The entire article is to be construed as a whole, and receive a practical, common sense construction."

*Rice v. Connolly*, 488 N.W.2d 241, 247 (Minn.1992) (quoting *State ex rel. Chase v. Babcock*, 175 Minn. 103, 107, 220 N.W. 408, 410 (1928)). We provide a brief history of the development of the judicial power of the state to provide context for our analysis.

The Minnesota Constitution vests judicial power of the state in the various courts. The original Minnesota Constitution of 1857 provided:

The judicial power of the state shall be vested in a supreme court, district courts, courts of probate, justices of the peace, and such other courts, inferior to the supreme court, as the legislature may from time to time establish by a two-thirds vote.

Minn. Const. of 1857, art. VI, § 1. Accordingly, the original language permitted the legislature to establish additional courts so long as they were inferior to the supreme court. In 1956, article VI, section 1, was amended to provide:

The judicial power of the state is hereby vested in a supreme court, a district court, a probate court, and such other

courts, minor judicial officers and commissioners with jurisdiction inferior to the district court as the legislature may establish.

Minn. Const. of 1857, art. VI, § 1 (1956). This amendment changed the definition of an inferior court. Before the amendment, a court was inferior so long as its jurisdiction was inferior to the *supreme court;* after the change, a court or judicial officer was inferior if their jurisdiction was inferior to the *district court.* After further amendment, Minn. Const. art. VI, § 1, currently provides:

> The judicial power of the state is vested in a supreme court, a court of appeals, if established by the legislature, a district court and such other courts, judicial officers and commissioners with jurisdiction inferior to the district court as the legislature may establish.

▪ The district court has "original jurisdiction in all civil and criminal cases." Minn. Const. art. VI, § 3. This felony first-degree murder case falls within the district court's original jurisdiction. *See* Minn. Stat. § 484.01, subd. 1 (2002); Minn. R.Crim. P. 26.01, subd. 1(1)(a); *State v. Sailor,* 257 N.W.2d 349, 351 (Minn.1977). Granting judicial officers the power to hear and try *all* civil and criminal cases may improperly infringe on the district court's original jurisdiction. "The legislature's delegation of an area of the district court's original jurisdiction calls for this court's close scrutiny." *Holmberg v. Holmberg,* 588 N.W.2d 720, 724 (Minn. 1999) (holding that the legislature infringed on the original jurisdiction of the district courts when it empowered administrative law judges to decide child support matters).

Harris maintains that allowing a judicial officer to hear and try a first-degree mur-

der case puts the officer "on the same footing" as a district court judge, in violation of the constitution's clear mandate that judicial officers have jurisdiction inferior to the district court. We have a common understanding of courts of inferior jurisdiction, and dictionary definitions are instructive and supportive of our understanding. Webster's defines an inferior court as "a court having limited and specified rather than general jurisdiction." *Webster's Third New International Dictionary* 1158 (1993). An inferior court is also termed "lower court." *Id.* at 1341. Conciliation court is an example of a contemporary court of inferior jurisdiction. *See* Minn.Stat. § 491A.01 (2002) (addressing establishment, powers, and jurisdiction of conciliation court division of district court). County and municipal courts also are familiar to us as historical examples of such inferior courts. *See* Minn.Stat. ch. 487 (2002) (addressing county courts); Minn. Stat. ch. 488A (2002) (addressing municipal courts for Hennepin and Ramsey Counties).

If an inferior court is one that has limited and specified rather than general jurisdiction, then it naturally follows that for a judicial officer to remain inferior to the district court under article VI, the judicial officer must have limited and specified jurisdiction. In other words, the judicial officer must be a person having limited rather than general jurisdiction.

The state maintains that a judicial officer may be assigned any district court matter, yet remain "inferior" in jurisdiction to the district court because his jurisdiction is granted on a case-by-case basis. According to the state, "The judicial officer receives whatever jurisdiction he has when the chief judge assigns him a case." Since the judicial officer has only "dependent"

jurisdiction—jurisdiction that is dependent on assignment by the chief judge—it is by definition inferior to the district court's jurisdiction.

To say that the judicial officer's jurisdiction is inferior because he can only hear cases assigned to him by the chief judge begs the question, however, because Minn. Stat. § 487.08, subd. 5, does not expressly limit the authority of the chief judge to assign matters to the judicial officer, stating only that judicial officers "shall hear and try matters as assigned to them by the chief judge." District court judges are subject to the same assignment authority by the chief judge of the district. Minn. Stat. § 484.69, subd. 3 (stating that "[t]he chief judge may assign any judge of any court within the judicial district to hear any matter in any court of the judicial district"). As we see it, the question is not whether the judicial officer's jurisdiction is *independent of* the district court; the question is whether his jurisdiction is sufficiently limited or specified so that his authority is *inferior to* the district court. We cannot say that this judicial officer did not entirely assume the role of a district court judge.[3]

The record reveals that the judicial officer presided over most of the pretrial proceedings, as well as Harris's entire trial, including jury selection, ruling on evidentiary objections, and instructing the jury. He also sentenced Harris to life in prison.

His order of judgment was appealable in the same manner as all other final orders of the district court. In sum, he presided over this entire felony trial and was utilized as the functional equivalent of a district court judge.

The power of the judicial officer to hear and try this felony level case was not limited and specific. Rather, the judicial officer exercised jurisdiction over a complex felony trial in which substantive constitutional issues were generally implicated. If judicial officers are allowed to preside over one of the weightiest matters within the district court's jurisdiction—a first-degree murder trial—then there is no effective limit to the judicial officer's jurisdiction.

▪ Statutes are presumed constitutional, and we will exercise our power to declare a statute unconstitutional "with extreme caution," *State v. Larsen*, 650 N.W.2d 144, 147 (Minn.2002), and only when there is no reasonable alternative construction available. *See In re Cold Spring Granite Co.*, 271 Minn. 460, 467, 136 N.W.2d 782, 787 (1965). Given the history of judicial officers in Minnesota and the unambiguous language of Article VI, we conclude that there is no reasonable alternative available. Therefore, we hold that the legislative grant of authority to the chief judge of a judicial district to assign any district court matter to a judicial officer pursuant to Minn.Stat.

---

**3.** The dissent is not troubled by a judicial officer assuming the role of a district court judge because, in the words of the dissent, "The judicial officer who tried this case meets the constitutional and statutory requirements [of a judge]." This characterization compels us to note that because Judicial Officer Maher was neither elected nor appointed by the Governor, he met neither of the requirements for a judge set forth in Article VI, §§ 7 and 8 of the Minnesota Constitution. In addition, the constitution sets a district court judge's term of office at six years and prevents the legislature from reducing a judge's salary during the term of his or her office. Minn. Const. art. VI, § 5. Judicial Officer Maher's term of office and salary is not constitutionally protected. Therefore, Judicial Officer Maher met none of the requirements and received none of the protections of a district judge.

§ 487.08, subd. 5, violates Article VI, Section 1 of the Minnesota Constitution, because the grant of authority runs afoul of the constitutional mandate that judicial officers be inferior in jurisdiction to the district court.[4]

*D. Harris is Entitled to a New Trial*

Next, we must determine whether Harris is entitled to a new trial because the judicial officer lacked authority to preside over his trial. Harris did not raise the issue of the judicial officer's authority until this appeal. The state urges us to apply plain error analysis and uphold the conviction.[5] Harris, on the other hand, maintains that the judgment is void where

the court lacks jurisdiction. We decline to adopt either of these analyses.

Ordinarily we limit our review of errors to which the defendant did not object at trial to those constituting plain error affecting substantial rights. *See State v. Griller*, 583 N.W.2d 736, 740–41 (Minn.1998); Minn. R.Crim. P. 31.02. In a case involving a fundamental question of judicial authority, however, we believe that plain error analysis is inappropriate. Under similar circumstances, the United States Supreme Court recently concluded that plain error analysis did not apply where the question was whether the participation of a non-Article III judge on an appeals panel invalidated the panel's judg-

---

4. Our holding is not inconsistent with the assignment of certain non-felony trials and other preliminary matters to a judicial officer. However, we decline to define the outer limits of a judicial officer's jurisdiction because that is a legislative function. *See* Minn. Const., art. VI, § 1.

5. The dissent would also uphold the conviction by applying the de facto court doctrine, even though neither party has asked us to do so. Because of the unique facts of this case, our de facto court precedent simply is not applicable here. A de facto judge is a "judge operating under color of law but whose authority is procedurally defective." *Black's Law Dictionary* 845 (7th ed.1999). Typically, we have applied the de facto judge doctrine when there is a technical defect in the judge's statutory authority. For example, we have found a judge to have de facto authority where he signed findings in a case just after his successor had taken the oath of office, *Carli v. Rhener*, 27 Minn. 292, 292–93, 7 N.W. 139, 139 (1880), and we have upheld the de facto authority of a justice of the peace where he filed his bond and oath with the village clerk of the county seat, rather than with the clerk of court, *Canty v. Bockenstedt*, 170 Minn. 383, 389, 212 N.W. 905, 907 (1927). *See also Marckel Co. v. Zitzow*, 218 Minn. 305, 310, 15 N.W.2d 777, 780 (1944) (approving the de facto existence of a municipal court where a two-thirds majority of the senate had

not voted for the bill establishing the court as required by the constitution at the time).

We have never applied the de facto doctrine in a case where the defect in the underlying statute "is not merely technical but embodies a strong policy concerning the proper administration of judicial business." *See Glidden Co. v. Zdanok*, 370 U.S. 530, 535–36, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (plurality opinion). Here we are confronted "with a question of judicial authority more fundamental than whether 'some effort has been made to conform with the formal conditions on which [a judge's] particular powers depend.'" *Nguyen v. United States*, —— U.S. ——, 123 S.Ct. 2130, 2136, 156 L.Ed.2d 64 (2003) (recognizing a "difference between an action which could have been taken, if properly pursued, and one which could never have been taken at all") (citation omitted). Accordingly, we decline to apply the de facto judge doctrine in these circumstances. *Cf. id.* at 2135–36 (declining to apply the de facto officer doctrine to uphold the judgment of an improperly constituted panel of the court of appeals).

Contrary to the dissent's assertion, our decision does not overrule this court's precedent on de facto courts and judges. We do not apply the doctrine to the assignment of a felony trial to a judicial officer because such an assignment is an action that could never have been properly pursued.

ment. *Nguyen v. United States,* —— U.S. ——, 123 S.Ct. 2130, 2137, 156 L.Ed.2d 64 (2003). The Solicitor General conceded that the panel of the Court of Appeals was improperly constituted, yet urged the court to apply plain error analysis because petitioners had failed to object to the panel's composition before the cases were submitted for decision. *Id.* at 2135. The *Nguyen* court declined to apply plain error analysis because "to ignore the violation of the designation statute in these cases would incorrectly suggest that some action (or inaction) on petitioners' part could create authority Congress has quite carefully withheld." *Id.* at 2137. The court explained that the composition of the panel violated a statutory provision that "embodies weighty congressional policy concerning the proper organization of the federal courts" and that "[e]ven if the parties had *expressly* stipulated to the participation of a non-Article III judge in the consideration of their appeals, no matter how distinguished and well qualified the judge might be, such a stipulation would not have cured the plain defect in the composition of the panel." *Id.; cf. N. Power Line, Inc. v. Minn. Envtl. Quality Council,* 262 N.W.2d 312, 321 (Minn.1977) (stating that parties cannot confer subject-matter jurisdiction on a court by consent).

Even more substantial issues are present here, because this case involves the unconstitutional delegation of authority to a judicial officer to preside over a complex felony trial. We cannot discount the constitutional defect in the authority of the judicial officer simply because Harris failed to raise the issue at trial. Accordingly, we conclude that Harris is entitled to a new trial before a district court judge.

Although we look with disfavor upon Harris's delay in raising the issue of the judicial officer's lack of authority until after his conviction, we nonetheless believe that it would be unjust not to consider his claim on direct appeal. We are mindful, however, of the potential consequences of our ruling on other felony trials over which a judicial officer has presided. *Cf.* Restatement (Second) of Judgments § 12 cmt. d (1982) (stating that in the context of collateral attacks on jurisdiction, the interests at stake "are governmental and societal, not those of the parties," and the question is whether the public interest "is sufficiently strong to permit a possibly superfluous vindication of the rule by a litigant who is undeserving of the accompanying benefit that will redound to him"). In deciding whether to give our ruling retroactive effect, public interest considerations are paramount. For example, we have approved the de facto existence of a municipal court to protect the public and to prevent confusion, uncertainty, and disorder, even though the act establishing the court was held unconstitutional. *Marckel Co. v. Zitzow,* 218 Minn. 305, 310, 15 N.W.2d 777, 780 (1944). Similarly, in nullifying the administrative child support process created by the legislature, we gave our ruling prospective application, concluding that retroactive application would be very disruptive without advancing the constitutional principle. *Holmberg,* 588 N.W.2d at 727; *see also State v. Misquadace,* 644 N.W.2d 65, 72 (Minn. 2002) (providing reasons that prospective application of holding is appropriate in a criminal case). Accordingly, because of the reliance by the parties and courts on this judicial officer's authority in other cases, and the potentially disruptive effect of retroactivity on the administration of justice, we limit application of our holding to this case and to pending and future cases.

Reversed and remanded.

Concurring in part and dissenting in part, GILBERT, J.

Concurring in part and dissenting in part, ANDERSON, RUSSELL A., and HANSON, JJ.

GILBERT, Justice (concurring in part, dissenting in part).

I concur with the majority that the legislature intended to permit the chief judge of the district to assign this felony matter to a judicial officer under Minn.Stat. §§ 487.08 and 484.69. I respectfully dissent from the majority opinion as to the constitutional power of a judicial officer to preside over this felony case. Even if the statute under which the judicial officer exercised authority is held unconstitutional, we should follow our long held precedent regarding de facto courts and the defendant should not receive a new trial. Any error must be reviewed for plain error. Here, if there was error, it was harmless and the jury verdict surely cannot be attributed to this alleged error. Furthermore, the objection should have been raised at any of the number of proceedings held by this judicial officer; that was not done and any objection was waived. The appellant received a fair trial and the jury verdict should be affirmed.

The majority incorrectly concludes that Minn.Stat. § 487.08, subd. 5, violates Article VI, § 1 of the Minnesota Constitution, because it runs afoul of the constitutional mandate that a judicial officer's jurisdiction be inferior to that of the district court. I cannot agree with the majority's assertion that where the judicial officer's jurisdiction in any given case is completely dependent on the assignment power of the chief judge of the district, the jurisdiction of the judicial officer is not inferior to that of the district court. Where the judicial officer's jurisdiction is coextensive, but entirely dependent upon the chief judge of the judicial district, the judicial officer's jurisdiction is necessarily inferior. As such, contrary to the holding of the majority, Minn.Stat. § 487.08, subd. 5, does not operate in violation of the Minnesota Constitution.

The majority states, "If judicial officers are allowed to preside over one of the weightiest matters within the district court's jurisdiction—a first-degree murder trial—then there is no effective limit to the judicial officer's jurisdiction." The majority ignores the obvious "effective limit" on the judicial officer's jurisdiction, the fact that the chief judge of the judicial district completely controls the jurisdictional limits of the judicial officer pursuant to Minn. Stat. § 487.08, subd. 5. Minnesota Statutes § 487.08, subd. 5, provides that a judicial officer "shall hear and try matters as assigned to them by the chief judge." Although a chief judge "may assign any judge of any court within the judicial district to hear any matter," Minn.Stat. § 484.69, subd. 3, a district judge is not dependent on that assignment power. Minn.Stat. § 484.01, subd. 1. In contrast to a judicial officer, "district courts shall have original jurisdiction in all civil actions within their respective districts, in all cases of crime committed or triable therein, in all special proceedings not exclusively cognizable by some other court or tribunal." Minn.Stat. § 484.01, subd. 1.

The majority also states, "Granting judicial officers the power to hear and try *all* civil and criminal cases may improperly infringe on the district court's original jurisdiction." Again, the majority has ignored that the legislature provided that the judicial officer can only have jurisdiction over cases the chief judge of the judi-

cial district has assigned to him. The majority, then, must be concerned that the district court will infringe on its own jurisdiction, but declines to describe how this could result. Such an unfounded and illogical worry cannot support overruling an act of the legislature and nullifying an otherwise fair trial.

The majority's mistaken premise may stem from an improper reliance on *Holmberg v. Holmberg,* 588 N.W.2d 720, 724 (Minn.1999), which the majority quotes to support its conclusion that the judicial officer's jurisdiction may infringe on the district court's jurisdiction. In *Holmberg,* the legislature had created an administrative hearing process that infringed on the district court's original jurisdiction. We stated that "the administrative child support process raises grave separation of powers concerns." *Id.* at 725. Under the child support adjudication scheme challenged in *Holmberg,* matters previously handled by the judiciary were improperly assigned for hearing by administrative law judges in the executive branch. *Id.* at 722. And it allowed non-attorneys (child support officers) to engage in the practice of law. *Id.* at 722 and 726. Here, there is no evidence of any improper infringement by the executive or legislative branches on the district court's power in any sense of the imagination. Rather, the authority to assign this case was vested with the judiciary. Minn. Stat. § 487.08, subd. 5. The legislature merely allowed the chief judge of the district court to exercise discretion to assign cases to a judicial officer, also a member of the judiciary. Minnesota Statutes § 487.08, subd. 5, does not infringe on the original jurisdiction of the district court and should not be held unconstitutional.

The majority states, "we decline to define the outer limits of a judicial officer's jurisdiction because that is a legislative function." Unfortunately, under the majority's rationale the outer limit of the judicial officer's jurisdiction remains a mystery, regardless of any action taken by the legislature. Nor does the majority address the inconstancy arising from this ruling, which prohibits the judicial officer from presiding over a felony trial, but leaves intact his power to handle important parts of felony cases, including the first appearance, bail setting and conditions, probable cause determinations, taking oaths and testimony, appointing public defenders, handling Rule 8 appearances, establishing release without bail, holding hearings for violation of conditional release and accepting pleas.[1] Thus, the legislature and the chief judge of the district court are left to guess what matters, if any, can be assigned to the judicial officer, so as to assure that his jurisdiction is sufficiently "inferior," such that this court will not overturn the result.

Even if Minn.Stat. § 487.08, subd. 5, is held to be unconstitutional, at a minimum, we should follow the de facto court precedent that has been well-settled law in this state since 1884. This court has held:

> But we may go so far as to lay down this proposition, that where a court or office has been established by an act of the legislature apparently valid, and the court has gone into operation, or the office is filled and exercised under such act, it is to be regarded as a *de facto* court or office. In other words, that the people shall not be made to suffer because misled by the apparent legality of such public institutions.

1. *See* Minn. R.Crim. P. 4.01; 4.02, subd. 5(1), (2); 4.03, subd. 1; 4.03, subd. 2; 5.01; 5.02, subd. 1(2); 5.03; 5.05; 5.06; 6.02; 6.03; 8.01.

*Burt v. Winona & St. Peter Railroad Co.,* 31 Minn. 472, 477, 18 N.W. 285, 287–88 (1884).

Sixty years following the decision in *Burt,* establishing the law of de facto courts, we reiterated our adherence to the principle that the acts of a judge acting under authority of an apparently valid statute are final and binding. "The theory that there may be a *de facto* court antecedent to the time the law creating the court is declared *unconstitutional* has become settled policy in this state since the issue first came before the court in *Burt v. Winona & St. P.R. Co.*" *Marckel Co. v. Zitzow,* 218 Minn. 305, 306, 15 N.W.2d 777, 778 (1944) (citation omitted) (second emphasis added). This judicial officer's position has been established by an apparently valid act of the legislature and has operated for a number of years. This case was assigned to this judicial officer by the chief judge of the district and our rules of court have added to his responsibility. As such, "it is to be regarded as a de facto court." *Burt,* 31 Minn. at 477, 18 N.W. at 287. There is nothing to distinguish the legal principle we clearly articulated in *Burt* from the one involved here, "antecedent to the time the law creating the court is declared unconstitutional" the court's actions are final and binding. *Zitzow,* 218 Minn. at 306, 15 N.W.2d at 778.

The majority's decision to overrule the 119-year-old precedent on de facto courts by ignoring it, however, still should not

result in overturning the appellant's first-degree murder conviction had the majority also not chosen to abandon our traditional plain error analysis. The majority looks to *Nguyen v. United States,* —— U.S. ——, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003), which is distinguishable from this case. *Nguyen* involved appointing a non-Article III judge as a member of a Ninth Circuit appellate panel in violation of a federal statute. *Id.* at 2133–34. In contrast to the congressional limitation, our legislature has left it up to the court to assign appropriate cases to this judicial officer, which our rules of criminal procedure have only further expanded. In fact, our Rules have empowered this judicial officer to perform many of the significant felony-level responsibilities that are carried out by the district court, which we now find to be unconstitutional.[2] If some of the felony-level judicial responsibility assumed by this court official is unconstitutional because his jurisdiction is not inferior to the district court, why would not this same rationale render all of his efforts exercised under our rules unconstitutional? Rather than follow our precedent, the majority creates a new standard to bypass plain error review "in a case involving a fundamental question of judicial authority."

The majority may have bypassed over our traditional plain error analysis in part because even if there was error, it was not plain, nor one that affected substantial rights.[3] A number of factors indicate that if any error occurred in this trial, it was

---

**2.** *See* Minn. R.Crim. P. 4.01; 4.02, subd. 5(1), (2); 4.03; 4.03, subd. 2; 5.01; 5.02, subd. 1(2); 5.03; 5.05; 5.06; 6.02; 6.03; 8.01.

**3.** The majority quotes a portion of the Restatement (Second) of Judgments § 12 cmt. d, in the concluding paragraph. The majority would be well served by looking to the sentence immediately following the language quoted from comment d. The sentence states,

"[t]he public interest is of that strength [requiring reversal of conviction] only if the tribunal's excess of authority was plain or has seriously disturbed the distribution of governmental powers or has infringed a fundamental constitutional protection." Thus, the very section of the Restatement cited by the majority supports undertaking a plain error analy-

not plain error: the appellant's two defense lawyers did not raise an objection at trial; the state allowed the case to proceed through a lengthy trial; the chief judge of the district assigned this case to this judicial officer; and the court of appeals did not sua sponte raise the issue in the two felony cases presided over by this officer that have been reviewed by that court in the past 3 years. *State v. Bauer*, 642 N.W.2d 760 (Minn.App.2002); *State v. Barnes*, 618 N.W.2d 805 (Minn.App.2000).

It is important in this analysis to remember the constitutional requirements of a judge. Although this judicial branch employee was appointed to this position, he meets the constitutional requirements of a judge. The constitutional requirements of our judges are that they be learned in the law, and that they be a resident of the district where they are presiding. Minn. Const. art VI, §§ 4, 5. The judicial officer who tried this case meets the constitutional and statutory requirements: he is learned in the law and a resident of the district and is employed by the judicial branch. Furthermore, this officer is under the jurisdiction of the Board on Judicial Standards. *See* Rules of Board of Judicial Standards, Definitions (defining judge as "any judge, judicial officer * * * employed in the judicial branch."). He is also governed by the code of judicial conduct. Minn.Code Jud. Conduct. He has for many years exercised the powers of a

district court judge in a wide variety of cases with the approval of the court of appeals and this court. This fact is demonstrated by the number of this judge's cases that have been decided by both the court of appeals and this court.[4]

The other constitutional requirements for a felony trial have also been met. This case was venued in the proper county, the trial was held in the appropriate courthouse and was tried to a jury with no objections as to the jury or the jury panel. *See* Minn. Const. art I, § 6. The trial appears to have been in full compliance with the Rules of Criminal Procedure relating to notices, time limits, scheduling, and the actual conduct of the trial.

If there was an error, it surely was not an error that could be classified as a traditional structural error. There was no allegation that this judicial officer was not learned in the law, was incompetent, was biased, or made any procedural errors in handling pretrial issues, voir dire, jury selection or instructions. The judicial officer in this case handled at least 7 separate days of pretrial issues, plus a 9 day jury trial covering 2 weeks, which resulted in the jury rendering a guilty verdict, all without objection. There were also two presumably competent defense lawyers present at all hearings representing the appellant and at no time was there ever any objection or even question about the

---

sis, which the majority has abandoned. Restatement (Second) of Judgments § 12 cmt. d.

**4.** *See, e.g., Bauer*, 642 N.W.2d 760; *State v. Cyrette*, 636 N.W.2d 343 (Minn.App.2001); *Myers v. Hearth Technologies, Inc.*, 621 N.W.2d 787 (Minn.App.2001); *State v. Barnes*, 618 N.W.2d 805; *Minnesota Teamsters Public & Law Enforcement Employees' Union, Local No. 320 v. County of St. Louis*, 611 N.W.2d 355 (Minn.App.2000); *St. Louis County v. S.D.S.*, 610 N.W.2d 644 (Minn.App.

2000); *Demolition Landfill Services, LLC v. City of Duluth*, 609 N.W.2d 278 (Minn.App. 2000); *Baker v. State*, 590 N.W.2d 636 (Minn. 1999); *Follmer v. Duluth, Missabe and Iron Range Ry. Co.*, 585 N.W.2d 87 (Minn.App. 1998); *In re Matter of Welfare of C.A.W.*, 579 N.W.2d 494 (Minn.App.1998); *Nat'l Audubon Soc. v. Minnesota Pollution Control Agency*, 569 N.W.2d 211 (Minn.App.1997); *State v. Brodie*, 532 N.W.2d 557 (Minn.1995); *State v. Brodie*, 529 N.W.2d 395 (Minn.App.1995).

proceedings being handled by this duly sworn judicial officer. In fact, it appears that the judicial officer handled all of the pretrial and trial proceedings except the initial arraignment, which was handled by a district court judge. Indeed, on appeal, other than the jurisdiction of this judicial officer, there was only one issue raised by appellant's counsel in the midst of many other rulings and proceedings that occurred in the pretrial and trial context. The only other issue raised on appeal relates to whether this judicial officer abused his discretion when he excluded an out-of-court statement by an allegedly critical defense witness who refused to testify because he feared retaliation by the victims' families. Importantly, this issue has been preserved for appeal and has been presented to this court for review based on the full transcript of what transpired at trial. This ruling by the judicial officer is of course subordinate to this court if we decided there was an abuse of discretion. We can review that issue on its full merits.

In terms of best practices, prospectively, a defendant should be informed that he may elect to have a district court judge try his case as opposed to this judicial officer. The record should include an explanation of the differences in appointed or elected positions and case assignments. This explanation should be placed on the record and include a defendant's waiver. However, the absence of this record in the present case does not mean appellant's trial was defective.

Finally, if there was an objection to having this qualified judicial officer hear this case, the objection should have been made known prior to the commencement of the trial. An objection is deemed waived if raised for the first time on appeal. *State v. Glowacki*, 630 N.W.2d 392, 398 (Minn. 2001). There is no support for the asser-

tion that the work of this judicial officer has undermined the trust or confidence of the practitioners and citizens of St. Louis County in our system of justice. In fact, two defense lawyers sat on their hands through trial knowing well of this issue that was presented only on appeal. Ironically, the article relating to judicial officers authored by John M. Stuart and cited by the majority pointed out this constitutional issue nearly 25 years ago, stating "it may be inappropriate for non-elected officials to exercise identical powers to that of the county court judges." Marlene Johnson & John M. Stuart, *Minnesota's Judicial Officers: A Short History of an Endangered Species*, Bench & Bar of Minn. 23, 28 (Dec.1979).

Stuart is the State Public Defender and the attorney of record for appellant. Stuart was of the opinion in 1979 that there were "very few complaints, if any, about constitutional problems arising from the appointive nature of the office." *Id.* Rather, he pointed out, "a possible problem by the appointive process is that judicial officers are not subject to the assignment power of the chief judges of the districts in which they serve." *Id.* Now, after the possible assignment problem has been corrected by the legislature and appellant is saddled with an unsatisfactory trial result, the appellant and his counsel, who were from the same office throughout this proceeding (at the district court and on appeal), are requesting a second bite at the judicial apple. Contrary to what the majority concludes, the interests of justice require that we affirm this conviction. "[T]he people shall not be made to suffer because misled by the apparent legality of such public institutions." *Burt*, 31 Minn. at 477, 18 N.W. at 288.

ANDERSON, RUSSELL A., Justice (concurring in part, dissenting in part).

I join in part with Justice Gilbert's dissent and conclude that the trial court—a

judicial officer—was a de facto court when, under longstanding practice and the color of legislative authority, he presided ably and without objection over the trial of Harris. I would affirm the judgment of the trial court as valid and binding under *Marckel Co. v. Zitzow,* 218 Minn. 305, 15 N.W.2d 777 (1944). When, as in *Marckel,* the order and judgment of a municipal court are valid and binding even when operating under a statute later declared unconstitutional, so also the judgment of a judicial officer is valid and binding when he operates under long-accepted practice and longstanding statutory authority, now declared unconstitutional. *Marckel,* 218 Minn. at 310–11, 15 N.W.2d at 780.

HANSON, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Russell Anderson.