STATE of Minnesota, Respondent,

v.

Steven YANG, Respondent.

No. C6–01–1362.

Supreme Court of Minnesota.

June 6, 2002.

Melissa Sheridan, St. Paul, MN, Attorney for Appellant.

Mike Hatch, Minnesota State Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant Ramsey County Attorney, Toni M. Lee, Certified Student Attorney, St. Paul, MN, Attorneys for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

On the morning of November 25, 2000, a man wearing a ski mask and armed with a sawed-off shotgun approached Xia Mee Vang, her husband Lue Lee, and their two-year-old daughter in Mounds Park in St. Paul. The man shot and killed Vang and then fled the scene. The police subsequently arrested appellant Steven Yang and charged him with Vang's murder. A grand jury indicted Yang for first-degree premeditated murder, a jury found him guilty of that charge, and the district court sentenced him to life in prison. Yang appeals, arguing that the court erred when it admitted evidence regarding his gang affiliation and when it refused to give a jury instruction on the defense of duress. We affirm.

Lue Lee arranged to meet his estranged wife, Xia Mee Vang,[1] in Mounds Park in St. Paul on the morning of November 25,

---

1. Lee and Vang were married in March 1998, but separated in July 1999. Vang's sister testified that although Vang and Lee were married in the Hmong tradition and were considered married in Hmong culture, they did not have a valid marriage license.

2000, ostensibly so that he could spend some time with their daughter. It was the day before the daughter's second birthday. Sometime later that morning, Vang and her daughter arrived at the park and met Lee by a large monument. Just before noon, 15–year–old Steven Yang approached the three family members wearing gloves and a ski mask and armed with a loaded, 12–gauge sawed-off shotgun. Yang told Vang and Lee "it was a stickup" and demanded money and jewelry, first pointing the gun at Lee and then at Vang. Although testimony varies about exactly what happened next, it is undisputed that Yang was 3 to 4 feet away from Vang, pointing the gun at her head when the gun went off, destroying a large part of her face and skull. Yang then fled the scene.

The police received a 911 call from Lee shortly before noon telling them that his wife had been shot. When the police arrived, they found Vang's body lying in front of the monument and Lee crouching behind the monument holding his daughter. Vang was later positively identified by dental records because her facial features were unrecognizable. Dr. Susan Roe, Assistant Ramsey County Medical Examiner, performed an autopsy on Vang and concluded that she died as a result of the injury sustained from the gunshot wound to her head.

The police considered Lee a suspect from the beginning, and therefore brought him directly from the crime scene to the homicide unit where he was interviewed for six hours. Based on information obtained during the interview and through other sources, the police determined that Thao Vue and Yang were involved in the shooting and arrested them the following day.

Sergeant Joseph Younghans interviewed Yang three times. Each interview was recorded. During the first interview on November 26, Yang denied any involvement with the shooting, claiming that he had slept until noon and then had gone to the Hmong New Year. After Younghans expressed continued disbelief about Yang's story, Yang said that he wanted to change his story and then admitted to being involved in the shooting. The details of Yang's involvement also changed during the course of the interview. Yang first explained that Lee wanted his wife killed so that Lee could get his daughter back and had hired Yang to commit the murder. Yang then explained that it was not supposed to be a murder and that Lee just wanted to scare Vang, as a warning, so that Lee could get his daughter back. He also stated that Lee was going to pay him $600 to kill Vang, but had not done so yet. Yang explained throughout the interview that the gun went off by accident when he was pointing it at Vang and that he did not intend to shoot her.

After the first interview, Yang guided the police to where he had thrown away the gun, shotgun shells, ski mask, and his clothing as he fled from the park. The police recovered the shotgun used in the shooting, one shotgun shell, two ski masks, and various articles of clothing. After Yang helped the police collect this evidence, he was taken back for another interview with Younghans. During the second interview, Yang clarified some of the confusion resulting from the first interview. Specifically, Yang admitted that the plan was to kill Vang—not just to scare her. Nevertheless, Yang stated that he changed the plan on his own and decided to go through with only the fake robbery part of the plan because he did not want to shoot anyone. Yang stated that when he was staging the fake robbery the shotgun went off by accident.

Younghans interviewed Yang for the third and final time the following day. During this interview, Yang provided more

details about the planning and commission of the shooting. Yang explained that he was supposed to steal a car and hide it near Mounds Park so it could be used as the getaway car. Then Yang and Vue were to borrow a car from a friend, drive to Mounds Park, and drop Yang off where they left the getaway car. Next, Yang was to drive the getaway car around the park until he heard an audio signal over a walkie-talkie. At this point, Yang was to drive up to Lee and Vang, stage the fake robbery, and shoot Vang. Yang was then supposed to get rid of the getaway car. During this third interview, Yang also described several other failed attempts to kill Vang.

Yang was subsequently indicted for first-degree premeditated murder in violation of Minn.Stat. §§ 609.185(1) (1998), 609.11 (2000), and 609.05 (2000). On January 18, 2001, Yang was certified to stand trial as an adult under Minn.Stat. § 260B.125 (2000). Yang pleaded not guilty and a jury trial was held, beginning on May 21, 2001.

Yang testified in his own defense and admitted that he went to Mounds Park with a loaded shotgun, staged a fake robbery, pointed the gun at Vang, and that the gun went off accidentally. Yang went on to describe the details leading up to the shooting. Four months prior to the shooting, Yang began living with his friend Vue in a house located on Western Avenue in St. Paul. Lee lived in a room on the third floor across the hall from Yang and Vue. A few weeks after Yang moved in, Lee asked Yang to go cruising. They went cruising and ended up on the east side of St. Paul by an apartment building. At this point, Lee stopped the car, took out a bottle of poison, and gave Yang a key. Lee wanted Yang to go into Vang's apartment and put poison in all of the food, but not to harm the baby. Yang refused and they then drove off.

A few more weeks passed and Lee again approached Yang about killing his wife. This time, Lee wanted to give Yang a gun and have him go to Vang's window and just start shooting into the apartment. Yang refused. The next day, Lee threatened to kill Yang and his family if he did not participate in Lee's plans. A few more weeks passed and Lee came up with a third plan. This time, Vue was also involved. Lee, Vue, and Yang drove to a place near Vang's apartment and planned to wait until Vang and her sister came home. While they were waiting, Yang retrieved two 12-gauge shotguns from the trunk, handed one to Lee, and kept the other for himself. Lee wanted to run up to Vang and her sister when they came home, make it look like a robbery, and force them to drive to Wisconsin where they presumably were to be killed. When Vang ultimately came home, she was accompanied not only by her sister, but by another person. At this point, Vue and Yang were both scared and refused to participate in the plan.

Yang next described the plan to shoot Vang in Mounds Park. On the night before the shooting, Lee, Vue, and Yang stole a car and left it near Mounds Park. Around 10:00 the next morning, they borrowed a second car. Yang and Vue drove the borrowed car and Lee drove his own car back to their home on Western Avenue. Once at home, they loaded the borrowed car with the sawed-off shotgun, ski mask, clothing, and a walkie-talkie. Yang testified that Lee had threatened him three times up to this point.

Yang testified that at some point after he, Lee, and Vue finished loading the borrowed car, Lee called Vang to arrange a meeting in Mounds Park. After arranging the meeting, Lee drove off in his car while Yang and Vue followed in the borrowed car. Both cars went to Target where Lee

picked up some toys for his daughter and then they headed toward the park. Although the plan was to drive together until they reached Mounds Park, Yang decided that he and Vue would turn off early and take another path to the getaway car than they had originally planned. Yang said that he had changed plans at this point and no longer intended to go through with the shooting and instead was only going to "fake the robbery and leave the scene." He testified that although the original plan called for Vue to wait and to meet Yang at a location near the park, Yang told Vue to meet him at the home of two friends, which was a location unknown to Lee. Vue dropped Yang off at the getaway car. Yang proceeded to drive this car around Mounds Park, waiting for the signal from Lee over the walkie-talkie. The signal came and Yang drove up and parked near where Lee and Vang were standing.

Yang testified that he approached Lee and Vang, and proceeded to act like he was robbing them. He told them "it was a stickup," pointed the gun at Lee and then at Vang, and demanded money and jewelry. At this point, Yang started looking around and noticed that a car had slowed down and that its occupants had started looking at them. He also noticed two children on a bike riding toward the park and two women heading toward the monument. Yang then put the gun down and turned to hide the gun from the street. At this point, he testified that he was holding the gun only by the handle, without a finger on the trigger. A second car stopped behind Yang and there were two people on his right staring at him from the end of the block. Yang testified that he was beginning to get scared and shaky and that the gun was getting heavy in his right hand, so he brought up his left hand to support the gun and the next thing he knew, the gun went off. He panicked, ran to the getaway car, drove away, parked the car, and began throwing away the gun and some of his

clothing. He then met Vue at the friends' house and changed into his spare clothing. Yang and Vue then left the friends' house, stopped to throw away the "bullets" and some more clothing, and returned the borrowed car to its owner.

After Yang testified as to the details of the shooting, he explained that he initially did not tell the truth to the police because he was scared of Lee and his gang members. He further explained that there were guns all over the house on Western Avenue where he lived with Lee and that Lee associated with gang members, some of whom came to the house while Yang was present.

On cross-examination, the state asked Yang about Lee's gang membership. Yang responded that he thought that Lee was a gang member. The state also asked whether Yang was a gang member. Yang responded that he "used to," but that he was no longer a member. Yang's attorney objected on the grounds that the questioning was irrelevant, prejudicial, and outside the scope of the direct examination. The court overruled the objections. The state then asked whether Yang was a member of the Crazy Bloods gang. Yang's attorney again raised the same objection, which also was overruled. Yang responded that he "used to associate with them," but that he did not associate with them any more. Yang testified that being a gang member and associating with a gang were the same thing to him. He also testified that he had a gang tattoo of "C.B." which stood for Crazy Bloods. Yang's attorney again objected to this line of questioning, but was overruled. Yang went on to testify that the Crazy Bloods were "my gang" and that they had been involved in some violent crimes. Yang testified that even with his own gang background, he was afraid of Lee.

Yang's attorney then renewed an earlier motion for a mistrial and elaborated on his objection to the state's cross-examination of Yang on the subject of gangs. The court denied the motion. Yang continued to testify and admitted that he did not tell Younghans about Lee's threats during his pretrial interviews. Finally, Yang admitted that although he had changed the plan, events unfolded according to Lee's plan.

The state's main witness was Vue. He testified following a plea agreement in which he pleaded guilty to second-degree murder in exchange for truthful testimony in both Lee's and Yang's trials. Under the terms of the agreement, Vue was to be sentenced to 25 years in prison. Vue testified that Lee wanted Vang dead because he hated her and because he did not want to pay child support. Vue testified that he knew about two plans to kill Vang. The first was similar to the third plan described by Yang, in which Lee, Vue, and Yang were going to wait for Vang and her roommate[2] to get home, "stick them up from their car, and take them to Wisconsin, and * * * kill them and make it look like a robbery." Vue testified, however, that the plan was abandoned not because they were scared, but because it was too risky given that Vang parked in front of the apartments instead of in the rear and because there were more people in the car than they had expected.

Vue then testified about the details of the plan to murder Vang at Mounds Park. The details in his testimony and Yang's were consistent up to the point where Yang testified that he changed the plan. Vue testified that they were supposed to take separate routes to the park so that they would not be seen together. Vue did not testify that Yang told him to change the plan or that he and Yang were to meet at the friends' house, unbeknownst to Lee. Instead, Vue testified that he dropped

Yang off at the getaway car and waited there for Yang to come back. Vue testified that Yang eventually came back and that they drove away together. Vue testified further that Yang did not tell him that he changed the plan or that the gun went off by accident. Finally, Vue testified that Lee never threatened him or Yang.

On cross-examination, Vue testified that there was actually a change in plans and that he was supposed to drop Yang off at the getaway car, but wait for him at the friends' house. He testified that while he did go to the friends' house when he waited for Yang, he eventually picked Yang up where they had parked the getaway car. Vue also testified that he and Yang went back to the friends' house after he picked up Yang.

As part of the state's case-in-chief, the state presented testimony from several firearms experts. First, the state called Officer Randy Barnett in his capacity as an armorer and the lead firearms instructor for the St. Paul Police Department. Barnett testified that it took between 4¾ and 5 pounds of pressure on the trigger to fire the shotgun used in the shooting whereas a standard-issue police shotgun has a trigger-pull of between 3½ and 3¾ pounds. Barnett also testified that there was a defect in the shotgun used in the shooting which "makes it a little more difficult or less likely for the weapon to be fired." Specifically, the gun had a defect in the slide-lock and slide-release lever so that any pull on the slide or pump would open the chamber and render the weapon unable to fire. Barnett testified that the slide had to be held forward to fire.

Barnett also testified that he attempted to drop, bump, and jar the shotgun in an attempt to make it fire without pulling the trigger. Barnett was never successful and

2. Yang testified that they were going to wait     for Vang and her *sister* to come home.

was unable to cause the gun to fire without pulling the trigger. Barnett testified that in his opinion the shotgun would not discharge unless the trigger was "moved to the rear."

The state also called Nathaniel Pearlson, a forensic scientist with the Bureau of Criminal Apprehension. Pearlson testified that when he was testing the shotgun, it never misfired or went off by itself. Finally, the state called Dr. Michael McGee, the Ramsey County Medical Examiner and an expert in forensic pathology. McGee testified that he test fired the shotgun seven or eight times to reproduce the close-range effects this shotgun had on the victim. McGee also testified that the gun never misfired, never fired without pulling the trigger, and never went off by itself.

After Yang rested his case, the state called Sergeant Richard Straka as a rebuttal witness. Straka was a former member of the Minnesota gang strike force and the east metro Asian gang task force and testified that Yang was, in his opinion, a member of the Crazy Bloods gang. Straka based his opinion on several criteria, including arrests, photographs, reliable sources, tattoos, and Yang's prior admissions. Straka also testified that during a conversation with Yang, Yang had brought up an issue regarding gangs. Specifically, Straka testified that Yang had asked about a shooting involving another member of the Crazy Bloods.

The state also recalled Younghans, who testified that Yang had not stated in any of

the three interviews that he had bumped the trigger or trigger guard of the shotgun with his hand. Instead, Younghans testified that Yang showed him how he was holding the gun when it went off. According to Younghans, Yang indicated that his right hand was on the stock of the gun just behind the trigger guard and his left hand was holding the gun at the back end of the slide.[3]

After both the state and the defense rested, Yang requested a jury instruction on the defense of duress and indicated that he had an opportunity to fully argue the merits of such an instruction in camera. The district court denied the request, concluding that the defense of duress was not applicable in this case. The jury found Yang guilty of first-degree premeditated murder and he was sentenced to life in prison. Yang appeals, asserting that the court committed prejudicial error when it admitted evidence regarding his gang affiliation because this evidence was both inadmissible character evidence and unfairly prejudicial. Yang also asserts that the court abused its discretion when it refused to give a jury instruction on the defense of duress.

I.

▮ We apply a deferential standard when reviewing a district court's evidentiary rulings. "[R]ulings on evidentiary matters rest within the sound discretion of the trial court." *State v. Olkon*, 299 N.W.2d 89, 101 (Minn.1980). Therefore, we will

---

**3.** All of Yang's pretrial interviews were recorded and played for the jury in their entirety. The first two interviews were also videotaped, and although transcripts were made to assist the viewer, the transcripts left out non-oral details. During the first interview, Yang made several demonstrations of how he held the shotgun. At first, he showed Younghans that he held the gun with his right hand only. At one point, however, he indicated that he was holding it with his right hand and then

brought his left hand up so that he was holding it with both hands overlapping—as if he were holding a handgun. During the second interview, Yang demonstrated that his hands were shaking and that he was holding the gun normally—with his right hand back on the grip and his left hand supporting the barrel where the pump would be. Yang never showed Younghans that his hand bumped the gun.

only overturn a court's evidentiary ruling if that court abused its discretion. *State v. Edwards*, 485 N.W.2d 911, 914 (Minn. 1992). The Minnesota Rules of Evidence provide that character evidence is not admissible for the purpose of proving that a defendant acted in conformity with his character on a particular occasion. Minn. R. Evid. 404(a); *see, e.g., State v. Loebach*, 310 N.W.2d 58, 63–4 (Minn.1981). Similarly, Minn. R. Evid. 404(b) provides that evidence of another crime, wrong, or act is not admissible to prove that a defendant acted in conformity with the earlier crime, wrong, or act. While Rules 404(a) and (b) operate to exclude character evidence if that evidence is offered to prove that the defendant acted in conformity with his character, if character evidence is offered for another purpose, Rules 404(a) and (b) do not apply. *State v. Axford*, 417 N.W.2d 88, 92 (Minn.1987). We have previously analyzed evidence of gang affiliation as character evidence under Minn. R. Evid. 404(b). *State v. Ferguson*, 581 N.W.2d 824, 834 (Minn.1998) (holding that evidence of gang graffiti and police testimony as to meaning of the graffiti was admissible because it tended to prove defendant's motive for murder).

Yang argues that although his credibility was at issue when he took the stand, gang-related evidence was not relevant to his credibility and instead was inadmissible character evidence. He argues that, because his gang affiliation was not offered for any of three permissible purposes, the state improperly presented it to show that he acted in conformity with his character.

Yang specifically argues that there are only three circumstances in which character evidence of a defendant's gang affiliation is admissible. He asserts that such evidence is admissible only (1) when the crime charged is gang-related; (2) when a witness is biased because of gang affiliation; and (3) when a witness is reluctant to testify because of fear of gang reprisal. Yang cites four cases in support of the proposition that gang-affiliation character evidence is inadmissible outside these three circumstances: *Ferguson*, 581 N.W.2d at 834; *State v. Harris*, 521 N.W.2d 348, 351–52 (Minn.1994); *State v. Chuon*, 596 N.W.2d 267, 270 (Minn.App.), *rev. denied* (Minn. Aug. 25, 1999); *State v. Brown*, 455 N.W.2d 65 (Minn.App.,), *rev. denied* (Minn. Jul. 6, 1990). These cases do not support Yang's argument. While gang-related character evidence was held to be properly admitted under the three circumstances identified by Yang, these cases do not stand for the proposition that admissibility is limited to these circumstances. Accordingly, Yang's assertion that gang-related character evidence is admissible only in these three situations is without merit.

██ The state argues that Yang's gang affiliation was offered because it was relevant to Yang's claim that he was afraid of Lee and his gang. The state asserts that once Yang claimed that he did not intend to kill Vang because he was acting under duress, evidence of Yang's gang affiliation was then relevant to a material fact—whether Yang had a reasonable basis to fear someone with gang connections. The state also argues that Yang "opened the door" to gang-related information by creating an impression that may have been favorable to Yang, yet ultimately inaccurate. Presumably, the favorable impression intended was that Yang was scared of gangs, but the state asserts that this might be an inaccurate impression because Yang was a gang member himself.

The state did not offer any evidence on Yang's gang affiliation in its case-in-chief. The state's first gang-related questioning came after Yang's direct examination and it was at this point that Yang testified that he was afraid of Lee's gang. On rebuttal,

the state presented expert testimony about gangs generally and that in the expert's opinion Yang was a gang member. Rules 404(a) and (b) only prohibit admission of character evidence when that evidence is offered to prove that the defendant acted in conformity with his character. Here, the state did not offer Yang's gang affiliation to prove that he acted in conformity with his character; instead, the state offered the evidence to rebut Yang's claim that he was afraid of Lee and his gang.

Under Minn. R. Evid. 404(a), there are three exceptions under which it may be appropriate to offer character evidence to prove a defendant's conformity with his character. The only exception relevant here is the first, which allows the defendant to offer character evidence and then allows the state to rebut such evidence. Minn. R. Evid. 404(a)(1). When Yang testified on direct examination that he was scared of Lee and his gang, he began painting a picture that remained incomplete until the state cross-examined Yang and presented rebuttal evidence on Yang's own gang membership and activities. Under Rule 404(a)(1), Yang's testimony regarding his fear of Lee and his gang opened the door and allowed the state's cross-examination and rebuttal regarding Yang's gang affiliation. Accordingly, we conclude that the evidence was relevant and not inadmissible under Rule 404(a) and (b).

## II.

■ Yang argues that even if the evidence related to his gang affiliation was relevant and admissible, the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. According to Yang, the gang evidence should have been excluded on the grounds that it was extremely prejudicial because the jury heard from him and an expert on gangs that (1) he was a gang member; (2) his gang committed violent acts; and (3)

he may have been involved with or knew about a gang-related murder. Yang argues that this evidence could not have failed to alarm, frighten, and tempt the jurors to convict him because he was a bad person.

■ Minnesota Rule of Evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. We have explained that "[i]n Rule 403, 'prejudice' does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Cermak,* 365 N.W.2d 243, 247 n. 2 (Minn.1985) (quoting 22 C. Wright & K. Graham, Federal Practice and Procedure—Evidence § 5215 (1978)). Even when evidence is highly damaging to the other side's case, it is admissible when it is highly probative. *Ferguson,* 581 N.W.2d at 834–35 (holding that evidence of gang graffiti in defendant's bedroom was highly prejudicial but admissible because it was also highly probative of defendant's motive).

Yang testified that he was afraid of Lee and his gang and that because of this fear he partly cooperated with Lee's plan. As we concluded above, the state was then free to admit gang-related character evidence to rebut Yang's assertion that he was afraid of gangs. The state first responded to Yang's testimony by cross-examining him on his own gang affiliation. Yang then admitted that he formerly associated with gang members, that he had a gang tattoo, and that his gang had been involved in violent crimes. We conclude that this evidence was not unduly prejudicial. The state was entitled to present a more complete picture of Yang's knowledge of gangs than was presented by Yang's testimony on direct examination.

Therefore, we hold that the court did not abuse its discretion when it permitted the state to examine Yang on his gang affiliation.

■■■ It is much less clear whether the expert testimony from Straka was similarly appropriate. Straka's testimony was cumulative with respect to Yang's testimony that he used to associate with gang members, that he had a gang tattoo, and that his gang was involved in violent crimes. Further, Straka went beyond what Yang himself testified to and discussed the official gang strike task force gang-membership criteria and stated that in his opinion Yang was currently a gang member. Nonetheless, even if the admission of such evidence was error, we will reverse Yang's conviction only if we conclude that the error was not harmless beyond a reasonable doubt. *Ferguson*, 581 N.W.2d at 833. In applying the harmless error analysis, we ask "[w]hat effect did the jury's hearing [the improperly admitted evidence] actually have on the guilty verdict rendered" and whether the verdict was "surely unattributable" to the error. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997). Here we hold that in light of Yang's own gang-related testimony, Straka's testimony was harmless beyond a reasonable doubt. Therefore, we need not decide whether the court abused its discretion by admitting Straka's testimony because the error, if any, was harmless beyond a reasonable doubt.

### III.

■■■ Yang's final argument is that the district court erred because it failed to give an instruction on the defense of duress—Yang's theory of the case. A party is entitled to a jury instruction on his theory of the case if there is evidence to support the theory. *State v. Ruud*, 259 N.W.2d 567, 578 (Minn.1977). The refusal to give a requested jury instruction lies within the district court's discretion and

we will not reverse that decision absent an abuse of discretion. *State v. Cole*, 542 N.W.2d 43, 50 (Minn.1996). A defendant is entitled to a duress instruction if the defendant sufficiently raises the issue as a matter of law. *See State v. Charlton*, 338 N.W.2d 26, 30–31 (Minn.1983). More specifically, the defendant bears the initial burden of production to make the defense of duress one of the issues in the case. *Id.*

■■■ The defense of duress has three parts and thus Yang bore the burden of production at trial that (1) he was under a present reasonable apprehension of instant death, due to threats, should he refuse to participate in the crime; (2) fear of instant death continued throughout the commission of the crime; and (3) he could not safely withdraw. *Id.* A threat of future harm is not sufficient to establish the defense of duress; instead, the threat must be of immediate death for noncooperation. *State v. Rosillo*, 282 N.W.2d 872, 873–74 (Minn.1979); *see also* Minn.Stat. § 609.08 (2000) (requiring threats creating "a reasonable apprehension * * * that [the] participator is liable to instant death").

Yang argues that he was entitled to the duress instruction because he presented evidence to support this defense theory. Specifically, Yang testified that Lee threatened him a total of three times. The first threat came after the second attempt to kill Vang and about two weeks before the third attempt. Lee threatened to kill Yang if he did not participate in Lee's plans, or alternatively if he ran away or went to the police. Lee also threatened to kill Yang's family if he was unable to find Yang. The second threat was made when Lee threatened Yang in order to force him to steal a car the night before the shooting. Finally, Lee threatened Yang the morning of the shooting.

Yang testified that he went through with the attempted robbery because he was

afraid that if he did not, Lee and Lee's gang members would come after him. Yang also explained that he continued to live with Vue and Lee at the Western Avenue house because he was afraid for his life if he left. Yang testified that he was afraid of Lee because Lee had threatened to kill Yang and his family. To support his claims, Yang presented testimony from Thomas Fries, a Ramsey County Juvenile Detention Center employee. Fries testified that on December 1, 2000, while Yang was in custody at the Juvenile Detention Center, Fries received a telephone call from a police officer regarding a threat on Yang's life. The officer explained that "they said they would blow [Yang's] head off."

The record contains no indication that Yang was compelled by the threat of imminent death at the time of the shooting itself. The record does suggest that Yang may have felt threatened before, during, and even after the time of the shooting, but the record does not show that Yang's fear was *reasonable* at the time of the crime or that he feared *instant* death. Yang does not claim that he was compelled at gunpoint to shoot and kill Vang. Instead, the record indicates that he was the only one with a weapon of any kind at the scene of the crime. The record also reflects that he could have withdrawn in safety at any point up to the time of the shooting. He was alone with Vue in the getaway car as they were driving to the park and could have directed Vue to drive away. After Vue dropped him off at the getaway car, the record reflects that he was alone, armed, and could have walked away from the stolen car and away from the crime. After starting the getaway car, he could have driven away. Even at the scene of the crime, he was the only person armed and could have driven or walked away instead of going through with the staged robbery. Finally, he did not have to pull the trigger.

The defense of duress is not available and a defendant is not entitled to a jury instruction on this defense unless he presents evidence tending to establish three things. *Charlton*, 338 N.W.2d at 31. The defendant must demonstrate that he was compelled to commit the crime because of a present reasonable fear of instant death, the fear of instant death continued throughout the commission of the crime, and he had no opportunity to safely withdraw. *Id.* Yang did not meet his burden of production and present evidence in support of a present, reasonable fear of instant death or that he was unable to safely withdraw. Therefore, because Yang did not introduce evidence to support his defense, we hold that the district court did not abuse its discretion when it refused to give the requested instruction on duress.

Affirmed.