STATE of Minnesota, Respondent,

v.

Montell Andre DeSHAY, Appellant.

No. C9–01–1128.

Supreme Court of Minnesota.

Oct. 9, 2003.

Michael C. Davis, Special Assistant State Public Defender, St. Paul, MN, for Appellant.

Michael A. Hatch, State Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, Alan L. Mitchell, St. Louis County Attorney, Duluth, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Appellant Montell Andre DeShay was charged by complaint in St. Louis County with conspiracy to commit a controlled substance crime in the first degree for the benefit of a gang, Minn.Stat. §§ 152.021, subd. 1(1) (2002), 152.096, subd. 1 (2002), and 609.229, subd. 2 (2002), and committing a controlled substance crime in the third degree for the benefit of a gang, Minn.Stat. §§ 152.023, subd. 1(1) (2002), and 609.229, subd. 2.[1] Following a jury

---

1. A criminal gang is defined as:

[a]ny ongoing organization, association, or group of three or more persons, whether formal or informal, that:

(1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9 [including felony controlled substance crimes];

(2) has a common name or common identifying sign or symbol; and

(3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

Minn.Stat. § 609.229, subd. 1 (2002).

The crime itself is defined in subdivision two as follows:

trial, DeShay was found guilty as charged. The district court entered a judgment of conviction for the conspiracy count and sentenced DeShay to an executed 98–month prison term. On appeal, DeShay challenged, among other things, expert testimony relating to gangs and gang affiliation. The court of appeals affirmed. Concluding that the admission of gang expert testimony was error but that the error was harmless, we affirm.

In 1999, Robert Jackley, a paid informant operating in that capacity for the Duluth police department, became acquainted with a group of seven to eight individuals who were selling crack cocaine and heroin imported from Milwaukee, Wisconsin. He knew the group members by "street names," including "Rat," a/k/a William Frazier, and "Animal," a/k/a Jim Lee. Jackley observed members of this group selling drugs from several locations and purchased drugs from most of them in a series of controlled buys. He also accompanied at least one member of the group to Milwaukee for the purpose of purchasing drugs for resale in Duluth.

Jackley met DeShay in December 1999 at Lee's home. Lee said DeShay was his nephew or cousin and introduced him as "Sickness." Jackley witnessed DeShay selling drugs several times, and on January 13, 2000, Jackley purchased approximately 0.1 grams of crack cocaine from DeShay in a controlled buy. After the purchase, Jackley asked DeShay if, in the future, he could buy drugs at a location near Lee's home and DeShay responded that he could. DeShay also told Jackley not to return to Lee's home because the group no longer did business there.

At DeShay's trial, in addition to Jackley, the following three witnesses testified to having seen DeShay selling drugs as a representative for the group: Paul Taylor and Robin Raymond—both of whom were police informants and heroin users; and Melissa Sabrowski, a former girlfriend of a group member. Taylor and Raymond each accompanied group members on trips to Milwaukee for the purpose of acquiring cocaine and heroin. Both stated that they were given heroin in exchange for allowing the group to use their Duluth apartments to repackage and sell the drugs obtained in Milwaukee. Sabrowski testified to having witnessed the sale of heroin, crack, and powder cocaine, to having joined group members on trips to Milwaukee to restock the drug supply, and to having seen DeShay hanging out with the other group members while drugs were being sold. However, Sabrowski testified that she had never witnessed DeShay selling drugs.

In addition to the testimony concerning the drug enterprise, Taylor, Raymond, and Sabrowski collectively testified that the group functioned as a criminal gang: they testified about the leadership structure of the group; the use of gang names and street names; gang colors; gang signs; gang jewelry—gold necklaces with the words "Breed" or "New Breed"; references to the group as "the Mob," "the New Breeds," a gang "off the G.D.s," a common abbreviation for the established gang the Gangster Disciples; and statements by some members, though not DeShay, that they were in a gang.

As part of the state's case-in-chief, over objection of defense counsel, Special Investigator Scott Jenkins of the Minnesota Gang Strike Force (MGSF) was permitted

A person who commits a crime for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members is guilty of a crime and may be sentenced as provided in subdivision 3. *Id.*, subd. 2.

to testify as an expert about gangs and gang affiliation.[2] Jenkins began by testifying about his credentials and experience. He stated that he had worked as a police officer for nearly twenty years, three years as a special investigator with the MGSF assigned to a regional unit covering eleven counties in the northeastern part of the state. Jenkins received training with the Minnesota Bureau of Criminal Apprehension, the gang unit of the Minneapolis police department, and national training on gang trends, surveillance, and working with informants. He testified about the use of informants in gang investigations and answered general questions about gangs. When asked "[w]hat sort of criminal activities are street gangs involved in," he responded: murder for hire, murder for the benefit of a gang, large and small scale narcotics trafficking, "[i]ntimidation-type crimes," criminal sexual assault, burglaries, property crimes, "[j]ust a whole myriad of different crimes."

Jenkins then was asked to discuss "the information you have gathered about that particular gang [the Black Gangsters or New Breed]." Jenkins proceeded to testify about a Midwestern street gang called the "Black Gangsters," also known as "Breed," "New Breed," "New Breed Disciples," or "Trey Ls," with which he had become familiar during his training and experiences. He stated that, as a "Midwest street gang," the gang started in Chicago and spread to smaller urban areas like those the size of Duluth. He talked about how Midwest gangs are generally divided into two rival groups, the people nation and the folk nation, each group having common signs, slogans, colors, tattoos, and jewelry. He said the Black Gangsters or New Breed are generally aligned under the folk nation, although "in some cases they are aligned under both the folk and people depending on how it benefits their gang."

The state then offered, for illustrative purposes, a chart created by Jenkins that purported to outline the Black Gangsters or New Breed Disciples, their representative symbols and colors, and their general alliance. Jenkins went on to talk about the gang's symbols, many of which came from the folk nation and others which came from the people nation, "being that they could have a general a[l]liance under either one." He talked about their main symbol which was "like a six-point star of David," each point representing different aspects of gang life: "life, loyalty, respect, knowledge, wisdom, and so on." He talked about other gang symbols, which were an upward facing pitchfork, a rabbit head with a cocked ear or a bent ear, and a heart with horns.

After this testimony, the state asked Jenkins, "[W]hat type of [criminal] activities or pattern of [criminal] activities is [this particular gang] involved with?" He proceeded to describe the gang's drug trafficking operations, person crimes of drive-by shootings and assaults, including sexual assaults, and property crimes including burglary and theft. He talked generally about how gang members gain

---

**2.** During the course of Jenkins' testimony, the district court overruled seven objections defense counsel made, including one "continuing ongoing objection to this entire line of testimony," which indicates that it might have been preferable to have qualified this witness as an expert outside the presence of the jury. Cf. *United States v. Alatorre*, 222 F.3d 1098, 1105 (9th Cir.2000) (stating that while federal courts are not required to conduct separate pretrial hearings to discharge evidentiary gatekeeping duties related to gang expert testimony, district courts should be mindful of difficulties in exploring an expert's qualifications and basis for the expert's opinion and give due consideration for requests that voir dire occur outside presence of jury).

"rank" by committing crimes or being born into the gang. He talked about how gang members would be held accountable to the gang, although differing "from gang to gang," with penalties ranging from exclusion from the gang "to a homicide." His testimony included a general discussion of how gangs often employ local people to facilitate their criminal enterprises by providing places to sell or hide drugs, delivering messages, and using their names for financing things like cars or cell phones.

Jenkins was then asked to discuss the ten-point gang identification criteria adopted by the Criminal Gang Oversight Council and used by MGSF to determine gang membership. For illustrative purposes, Jenkins offered the list of the criteria.[3] Jenkins also explained the derivation of the criteria, noting that the criteria ultimately adopted were based in large part upon criteria already in use on the West Coast and in other areas of the Midwest, like Chicago and Detroit: "[T]hese criteria are a conglomeration of all of those things that have been grabbed from other areas of the nation."[4] The state then began the process of going through the criteria, asking Jenkins the factors he looked to when determining gang affilia-

tion. Jenkins then went through all ten of the criteria and explained the significance of each one, providing examples for some and explanations for why others were considered to have predictive value of gang membership.

The state next asked about the MGSF's records on individual gang involvement and investigation and about the use of street names by gang members. Jenkins stated that street names are very common and are often very similar to each other and the MGSF database helps investigators track individuals according to their legal and street names. He then explained that when the MGSF tracks an individual, the protocol is that if the individual has one or two of the ten-point gang criteria, he is classified as a suspected gang member or an associate. "If they have three or more criteria total, then they're considered a confirmed gang member. If they have three or more of the criteria total, plus a gross misdemeanor or felony conviction, or an adjudication as a juvenile for a felony, then they're considered confirmed convicted."

The state then proceeded to ask Jenkins specific questions about his investigation of

3. The ten criteria listed by Jenkins are as follows: (1) admits gang membership or association; (2) is observed to associate on a regular basis with known gang members; (3) has tattoos indicating gang membership; (4) wears gang symbols to identify with a specific gang; (5) is in a photograph with known gang members and/or using gang-related hand signs; (6) name is on a gang document, hit list, or gang-related graffiti; (7) is identified as a gang member by a reliable source; (8) arrested in the company of identified gang members or associates; (9) corresponds with known gang members or writes and/or receives correspondence about gang activities; and (10) writes about gangs, which would be graffiti on walls, books, and/or paper. *See also State v. Frazier*, 649 N.W.2d 828, 834–35 (Minn.2002).

4. The Criminal Gang Oversight Council consists of the Commissioners of Public Safety and Corrections, the Superintendent of the Bureau of Criminal Apprehension, the Attorney General, and several police chiefs, sheriffs, and other law enforcement officers. Minn.Stat. § 299A.64, subd. 1 (2002). As part of its mandate to develop strategy to address the harm posed by criminal gangs, the council was directed to "develop criteria and identifying characteristics for use in determining whether individuals are or may be members of gangs involved in criminal activity." Minn.Stat. § 299A.64, subd. 2(b) (2002). The council was also directed to "develop procedures and criteria for the investigation of criminal gangs and crimes committed by those gangs throughout the state." *Id.*

the New Breed in Duluth. Jenkins then testified about his knowledge of the drug trafficking ring and his assignment to track the associated parties. He described collecting information from police informants, interviews conducted by the MGSF and narcotics investigators within the Duluth police department, police reports, arrest records, and interviews he personally conducted with some of the suspected gang members. He then gave the names of the individuals he became familiar with in the context of the investigation, beginning with an individual he said was "believed to be the leader of this group of gang members." He went on to name others, including "Frazier, who is a Black Gangster and is known by the street name of Rat," and "Jim Lee, also a documented Gangster Disciple, who is a close associate of the Black Gangsters." Jenkins said Lee "is known by the street monnikar [sic] of Animal." Jenkins finished the list of eight individuals, six of whom he specifically stated had a gang affiliation, with "Montell DeShay, who is also known as Sickness. I believe that covers the group."

Next, the court permitted the state to introduce, for illustrative purposes, charts Jenkins had prepared as "documenting the ten point criteria with the individual names of the parties that [he] just mentioned." The state then asked Jenkins, based on his "investigation, and gathering information from various agencies and [his] interviews," to match gang identification criteria to the individuals named on the charts. After referencing his investigative notes, Jenkins proceeded to identify which of the ten criteria applied to each of the individuals on the charts, adding that some of the individuals had convictions for controlled substance crime committed for the benefit of a gang, sexual assault, and auto theft. Jenkins identified three criteria that applied to DeShay: observed to associate on a regular basis with known gang members;

identified as a gang member by a reliable source—Sobrowski; and arrested in the company of identified gang members or associates. After going through all the individuals on the exhibit charts, Jenkins was allowed to offer his opinion that five of the individuals on the charts, one of whom was DeShay, were members of the New Breed–Black Gangsters gang.

On cross-examination, Jenkins admitted that he had not been personally involved in collecting the information that led to classifying DeShay as someone who associated on a regular basis with known gang members. Defense counsel asked similar questions related to the other criteria used by Jenkins to classify DeShay as a gang member. Through questioning, defense counsel got Jenkins to confirm that his "opinion is based upon [MGSF] criteria, and [it] * * * is the basis upon which [he said] that Montell DeShay is a gang member."

DeShay chose not to testify in his own behalf. Lee's wife, Katherine Cisotto, appeared for the defense. Cisotto testified that DeShay did not sell drugs from her home in January 2000 and that she had no knowledge of any drug sales from her home in December 1999 or January 2000. Cisotto also stated that, to her knowledge, Jackley had not been in her home, Taylor had been in her home only once or twice, and Raymond was there only once on December 3, 1999 for a reason unrelated to drugs. On cross-examination, Cisotto admitted that her daughter, who had been living in the home with her and Lee in December 1999 and January 2000, had been convicted of selling drugs to Jackley from that home on December 1, 1999.

The jury found DeShay guilty of conspiracy to commit a controlled substance crime for the benefit of a gang and committing a controlled substance crime for

the benefit of a gang. Judgment was entered on the conspiracy conviction and DeShay was sentenced to a presumptive executed term of 86 months for the underlying conspiracy crime and an additional 12 months for the benefit-of-a-gang crime. Minnesota Sentencing Guidelines II.G. DeShay appealed, challenging, among other things, the admissibility of the gang expert testimony. The court of appeals affirmed, finding no error in the admission of the expert testimony, and we granted further review.[5]

## I.

■ The first issue we address is the admissibility of gang expert testimony. We have consistently stated that determinations of an expert witness's competency and the adequacy of the foundation offered in support of expert witness testimony are matters that rest within the sound discretion of the district court and we will not reverse absent clear error. *State v. Nystrom*, 596 N.W.2d 256, 259 (Minn.1999) (citing *State v. Koskela*, 536 N.W.2d 625,

629 (Minn.1995)). The issue here, however, is not whether the expert was competent or relied on an adequate foundation for his testimony, but whether the issues and subject matter were appropriate for expert testimony.[6]

■ Minnesota Rule of Evidence 702 provides that an expert may testify "in the form of an opinion" if his or her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The "ultimate question of admissibility" for expert testimony is whether the expert's testimony will help the trier of fact in evaluating evidence or resolving factual issues. *Koskela*, 536 N.W.2d at 629. Minnesota courts have allowed law enforcement officers to provide expert testimony in a number of criminal contexts. In *State v. Klawitter*, 518 N.W.2d 577 (Minn.1994), we allowed opinion testimony by experienced police officers trained in the use of drug recognition protocol. *Id.* at 586. In *State v. Sandberg*, 406 N.W.2d

---

**5.** On September 8, 2003, DeShay moved to reopen this appeal to allow additional briefing and oral argument on a new issue, generated by our opinion in *State v. Harris*, 667 N.W.2d 911 (Minn.2003) (holding that defendant was entitled to a new trial because the judicial officer before whom his case was tried did not have jurisdiction to preside over felony trials). DeShay contends that under *Harris* he is entitled to a new trial because his case was also tried before the judicial officer who heard the *Harris* case. We held that *Harris* will apply prospectively to "pending" cases. The state opposes relief here, arguing that *Harris* should not apply because DeShay did not raise the judicial officer issue before the district court or in his direct appeal. The state asserts that raising the issue post-briefing and post-argument bars any relief.

We decline to delay the release of our decision of this case and its companion case, *State v. Lopez–Rios*, —— N.W.2d ——, (Minn. 2003), for briefing and argument of the judicial officer issue. Nevertheless, because DeShay

sought to raise this issue before the completion of his direct appeal, we conclude he should not be foreclosed from arguing that *Harris* should apply. We therefore will allow DeShay to address the issue in a postconviction proceeding. By doing so, we do not express any opinion on whether this procedural posture should be treated as a "pending" appeal entitled to relief under *Harris*.

**6.** The special concurrence expresses concern that defense counsel failed to make specific and timely objections to the gang expert's testimony. As indicated earlier, defense counsel made numerous objections to this testimony, all of which were overruled. We conclude that the defense's objections were sufficient to preserve the issue for review here. Moreover, " '[a]n accused, whether guilty or innocent, is entitled to a fair trial, and it is the duty of the court, and of prosecuting counsel as well, to see that he gets one.' " *State v. Litzau*, 650 N.W.2d 177, 185 n. 6 (Minn.2002) (quoting *State v. Haney*, 222 Minn. 124, 125, 23 N.W.2d 369, 370 (1946)).

506 (Minn.1987), a police officer was permitted to testify as an expert concerning the reporting practices of adolescent sexual assault victims. *Id.* at 511. In *City of St. Paul v. Various Items of Drug Paraphernalia*, 474 N.W.2d 413 (Minn.App. 1991), a police officer was permitted to testify as an expert regarding the primary use of seized items as drug paraphernalia. *Id.* at 418. In all of these cases, expert police testimony added "precision or depth to the jury's ability to reach conclusions," *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980), even on subjects within the jury's common experiences and, therefore, satisfied the helpfulness test. *See State v. Bradford*, 618 N.W.2d 782, 793 (Minn. 2000).

Nevertheless, we have stated that, especially in criminal cases, district courts should exercise caution in admitting expert testimony because of the potential for experts with specialized knowledge to unduly influence the jury. *See Nystrom*, 596 N.W.2d at 259–60. For that reason, we concluded that expert police testimony about statistical crime rates and criminal activity in the community was inadmissible because the testimony would not have been helpful to the jury and was not relevant to the defendant's proffered self-defense theory. *See id.* at 260.

We previously touched on the issue of gang expert testimony in *State v. Yang*, 644 N.W.2d 808 (Minn.2002). In *Yang*, we questioned the propriety of gang expert testimony from a former MGSF member given as a rebuttal witness for the state:

It is much less clear whether the expert testimony from Straka was similarly appropriate. Straka's testimony was cumulative with respect to Yang's testimony that he used to associate with gang members, that he had a gang tattoo, and that his gang was involved in violent crimes. Further, Straka went beyond

what Yang himself testified to and discussed the official gang strike task force gang-membership criteria and stated that in his opinion Yang was currently a gang member. Nonetheless, even if the admission of such evidence was error, we will reverse Yang's conviction only if we conclude that the error was not harmless beyond a reasonable doubt. * * * * Here we hold that in light of Yang's own gang-related testimony, Straka's testimony was harmless beyond a reasonable doubt.

*Id.* at 818.

We have consistently expressed our concern that expert testimony be carefully monitored in criminal cases so that a jury is not dissuaded from exercising its own independent judgment. *See Nystrom*, 596 N.W.2d at 259–60; *Klawitter*, 518 N.W.2d at 585. We have been "very reluctant to allow experts to testify about matters that are generally for the jury's determination." *State v. Ritt*, 599 N.W.2d 802, 812 (Minn. 1999). "If the issue can be resolved by applying principles of general or common knowledge and the jury is in as good of a position to resolve an issue as the expert, then expert testimony would be of little assistance to the jury and should not be admitted." 11A Peter N. Thompson & David F. Herr, *Minnesota Practice— Courtroom Handbook of Minnesota Evidence*, 152 (2003 ed.).

█ Here, the jury needed to decide certain specific factual issues. First, it needed to determine if DeShay committed a crime. Then, it needed to determine whether this particular group of people was a criminal gang and whether DeShay was a member of or associated with the group. *See* Minn.Stat. § 609.229, subd. 1. Next, it needed to decide if the crime was committed "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang."

Minn.Stat. § 609.229, subd. 2. Finally, it needed to determine if the act was done with the "intent to promote, further, or assist in criminal conduct by gang members." *Id.* To have been admissible, Jenkins' expert testimony must in some way be helpful to the jury when making these factual determinations. We conclude that much of it was not.

Gang expert testimony in this noncomplex drug conspiracy, to the extent relevant, was largely duplicative, giving little assistance to the jury in evaluating the evidence.[7] Witnesses with first-hand knowledge had already testified that DeShay was associated with a group that included at least three people; that the group, the New Breed, came from Milwaukee; that the New Breed was related to the Gangster Disciples gang; that the New Breed group's primary activity was a profitable drug trafficking operation; that the New Breed group used nonmember drug addicts to facilitate the transportation and sale of drugs; that the group had a gang name, New Breed, used gang terms, flashed gang signs, and referred to the group as a gang. This first-hand knowledge testimony is how the state can and should go about proving the essential elements of this crime. Further, it was neither helpful nor relevant to the fact issues before the jury to have expert testimony that crimes committed by criminal gangs in general run the gamut from "murder for hire" to property crimes, that New Breed gangs engage in drive-by shootings, or that certain individuals associated with the New Breed group involved in this case had

prior convictions for criminal sexual conduct and crimes committed for the benefit of a gang.

That jurors do not need extensive testimony from an expert to enlighten them on indicia of gang membership is borne out by the state's closing argument to the jury during which the state told the jurors that these crimes are basically a matter of witness credibility. While benefit-of-a-gang expert testimony logically adds nothing to witness credibility, it does strongly suggest to the jury that a law enforcement specialist believes the state's witnesses and therefore the jury should find the defendant guilty. There are, no doubt, cases where the testimony of an expert may prove helpful on aspects of criminal gangs, but this is not one of those cases. *See United States v. Lui,* 941 F.2d 844, 848 (9th Cir.1991) (holding that modus operandi testimony is generally inadmissible, although such testimony might be admissible in cases involving complex smuggling conspiracies).

■ Moreover, the state should not be permitted to launder inadmissible hearsay evidence, turning it into admissible evidence by the simple expedient of passing it through the conduit of purportedly "expert opinion." That criminal gang involvement is an element of the crime does not open the door to unlimited expert testimony. *See, e.g., State v. Brom,* 463 N.W.2d 758, 763–64 (Minn.1990) (holding that psychiatric testimony on issues of intent and premeditation in murder trial

---

7. We are also concerned with the helpfulness of the ten criteria developed by the Gang Strike Force. Jenkins stated that an individual is an imputed gang member if he meets one or two of the criteria and is considered a confirmed gang member if he meets three or more of the criteria. Yet certain of the criteria may involve the exact same evidence so that a person could be considered a con-

firmed gang member because the exact same evidence meets two of the criteria. For example, the same evidence can satisfy criterion # 2 "is observed to associate on a regular basis with known gang members or individuals who have already been classified as such using these criteria" and criterion # 8 "is arrested in the company of identified gang members or associates."

properly excluded); *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980) (holding expert testimony on unreliability of eyewitness identification in robbery trial properly excluded); *State v. Yates,* 392 N.W.2d 30, 32 (Minn.App.1986) (holding expert testimony on issue of specific intent in aggravated assault trial properly excluded).[8]

Finally, the allegation that a defendant is in a gang ought not serve as a justification for extensive expert testimony regarding criminal gangs. *Cf. United States v. Lombardozzi,* 2003 WL 1907965, at *3–4, ——— F.Supp.2d ———, ——— (S.D.N.Y.2003) ("The allegation that a defendant is in the mob is not a shibboleth, the mere incantation of which opens the door to extensive expert testimony regarding organized crime"; and holding that expert testimony regarding structure of organized crime families must be limited to the extent necessary to understand relationship between defendant and former defendant who pleaded guilty); *United States v. Alatorre,* 222 F.3d 1098, 1099 (9th Cir.2000) (affirming trial court

ruling that expert testimony about the value of marijuana seized and whether it was of a distributable quantity was admissible, but organization and structure of drug enterprise was not admissible unless defense opened the door); *United States v. Long,* 917 F.2d 691, 702–03 (2d Cir.1990) (holding that expert testimony regarding hierarchical structure and methods of operation of crime families improperly introduced in RICO prosecution); *Utz v. Commonwealth,* 28 Va.App. 411, 505 S.E.2d 380, 386 (1998) (holding that trial court properly limited gang expert evidence to that which was relevant to show motive other than self-defense for shooting the victim). Seemingly unlimited development of the roles and activities of gangs in general and gangs unrelated to the defendant is unnecessary, potentially prejudicial and, as a practical matter, places the defendant in the position of defending allegedly criminal activities of others, regardless of formal charges.

In summary, we conclude that expert testimony must assist the jury to

---

**8.** As for the Minnesota Gang Strike Force identification criteria, several commentators consider the criteria unreliable in the identification of gang members. Plácido G. Gómez, *It is Not So Simply Because an Expert Says it is So: The Reliability of Gang Expert Testimony Regarding Membership in Criminal Street Gangs: Pushing the Limits of Texas Rule of Evidence 702,* 34 St. Mary's L.J. 581, 609–621 (2003) (describing the manner in which the criteria lack reliability); Jeffrey J. Mayer, *Individual Moral Responsibility and the Criminalization of Youth Gangs,* 28 Wake Forest L.Rev. 943, 965–67 (1993) (noting that the various criteria were "invariably overbroad," notable for "their circuitry and potential for abuse" and amount to "little more than licenses to arrest or control youths in the absence of any articulable suspicion"); *see also* Susan L. Burrell, *Gang Evidence: Issues for Criminal Defense,* 30 Santa Clara L.Rev. 739, 773 (1990) ("There is no way for an individual officer to become qualified to render [a gang] expert opinion, because there is no reli-

able, generally accepted body of knowledge upon which the opinion may rest."). In addition, the criteria are merely a profile, " 'simply an investigative technique. It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity.' " *People v. Hubbard,* 209 Mich. App. 234, 530 N.W.2d 130, 132–33 (1995) (quoting *United States v. McDonald,* 933 F.2d 1519, 1521 (10th Cir.1991)). The United States Supreme Court offered a more tailored definition in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where a "drug courier profile" was described as "an abstract of characteristics found to be typical of persons transporting illegal drugs." *Id.* at 493 n. 2. Profile evidence, akin to character evidence, is plainly inadmissible as substantive evidence of guilt. *Litzau,* 650 N.W.2d at 185 (citing *State v. Williams,* 525 N.W.2d 538, 548 (Minn.1994)); *see also State v. Loebach,* 310 N.W.2d 58, 63 (Minn.1981) (battering parent profile evidence inadmissible).

understand the evidence or to determine a fact in issue. The district court should scrutinize proffered gang expert testimony, preferably outside the presence of the jury, "and exclude it where irrelevant, confusing, or otherwise unhelpful." *State v. Miles*, 585 N.W.2d 368, 371 (Minn.1998). Such testimony must add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience. Moreover, this testimony must be carefully monitored by the court so that the testimony will not unduly influence the jury or dissuade it from exercising its independent judgment. Even if acceptable under Rule 702, expert testimony should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Minn. R. Evid. 403. In this noncomplex drug conspiracy case, much of the gang expert's testimony was duplicative and of little real assistance to the jury in evaluating the evidence. Therefore, inasmuch as there was little, if any, real value to much of the gang expert testimony, especially when considered in light of its probative value versus potential prejudice, we hold that its admission was error.

## II.

■■■■ Having determined that Jenkins' gang expert testimony was inadmissible, we must now determine whether admission of that testimony was sufficiently prejudicial to justify a new trial. " 'Reversal is warranted only when the error substantially influences the jury's decision.' " *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn.2003) (quoting *State v. Nunn*, 561 N.W.2d 902, 907 (Minn.1997)). As indicated, Jenkins' testimony was, for the most part, duplicative of testimony given by witnesses with first-hand knowledge of the

relevant events and which established that DeShay was a member of, and involved with, a group that operated as a criminal gang. Accordingly, we hold that any error that may have occurred by admitting Jenkins' gang expert testimony was harmless because, in light of the other witnesses' testimony, there was no reasonable possibility that Jenkins' testimony substantially influenced the guilty verdict.

Affirmed.

HANSON, Justice, took no part in the consideration or decision of this case.

GILBERT, Justice (concurring specially).

I concur with the result of the majority's opinion, which affirms the court of appeals' holding, but respectfully disagree with the majority's analysis, which finds that admission of gang-related expert testimony was error. I would not only affirm the conviction, but also apply the court of appeals' analysis on gang-related expert testimony.

The appellant was charged with a conspiracy to commit a controlled substance crime in the first degree for the benefit of a gang and for the commission of a controlled substance crime in the third degree for the benefit of a gang.[1] The legislature passed this legislation as a part of an effort to target the growth of gang-related criminal activity. Under these statutes, the state has the burden to prove beyond a reasonable doubt that there was criminal activity committed for the benefit of a gang. Proving this necessarily involves proof of this behavior and that it occurred for the "benefit of a gang." Proving this element may undoubtedly be prejudicial. However, the question unanswered by the majority opinion is: how can the state

---

1. *Minn.Stat.* § 152.021, subd. *1(1)* (2002); Minn.Stat. § 152.023, subd. 1(1) (2002); Minn.Stat. § 152.096, subd. *1* (2002); and Minn.Stat. § 609.229, subd. 2 (2002).

prove this essential element, if not through expert testimony?

The court of appeals affirmed the district court's use of the gang testimony offered by special investigator Scott Jenkins of the Minnesota Gang Strike Task Force (MGSF). The court of appeals pointed out that the appellant challenged the use of this testimony based on:

the witness's methodology; that is, the set of observations and conclusions making up the ten-point gang criteria on which the witness relied in giving his opinion that De Shay [sic] and others were gang members. This does not concern the *facts or data* on which the witness relied; the phrase "facts or data" in this context refers to the facts in the particular case in which the witness is testifying and that the witness has accepted as true in giving his opinion. *Facts or data* are to be distinguished from the *methodology* the witness applied in giving his opinion.

*State v. DeShay*, 645 N.W.2d 185, 191 (Minn.App.2002) (emphasis in original).

The court of appeals concluded that "there is an ample showing of the reliability of the ten-point gang criteria, sufficient to allow an expert to utilize them in forming an opinion on whether an individual is a member of a gang. The criteria were authorized by the legislature. Minn.Stat. § 299A.64, subd. 2(b) (2000)." *Id.* at 192. The court noted that law enforcement experts in the field rely on the gang identification criteria, that it is common practice for experts in a number of other jurisdictions to rely on similar gang criteria, and that this type of criteria is the type relied upon by experts in the field. *Id.*

The court of appeals also pointed out that the evidence of gang criteria was offered to prove an element of the offense; that the crime was for the benefit of a gang and "[i]n fact, DeShay does not assert that the criteria are being used as character evidence; instead, he attacks them as being an improper basis for an expert opinion." *Id.* at 193. The court of appeals concluded that because most of these criteria "are primarily elements of self-identification for people who have an interest in being identified with a group," this focus is "on a much narrower group of persons" than the "external criteria" we addressed in the drug courier profile case of *State v. Williams*, 525 N.W.2d 538, 546–48 (Minn.1994). *Id.*

The appellant also raised an equal protection argument relating to Minn.Stat. § 609.229, but conceded that if this court affirmed the court of appeals' holding in *State v. Frazier*, 631 N.W.2d 432, 437 (Minn.App.2001), that holding would be dispositive of this issue. We affirmed the court of appeals on the equal protection argument, but on different grounds. *See State v. Frazier*, 649 N.W.2d 828, 836–37 (Minn.2002). Our holding in *Frazier* was based, in part, upon the appellant's failure to present information from any source which would enable us to evaluate whether the MGSF criteria are reliable indicators of gang membership. *Id.* at 835. In fact, we stated that "[b]ecause neither party presented any analysis of the data or expert testimony, we lack an adequate record to evaluate whether section 609.222 creates a race-based classification in practice." *Id.* at 836. We further explained that "[w]hat we do require, however, is a factual record that permits us to evaluate the reliability and validity of both the data and the data analysis." *Id.*

In this case, we are again confronted with an equal protection argument with a similarly deficient record. There is no analysis of the data, no expert or rebuttal testimony, and no cross-examination challenging the reliability and validity of the evidence presented. Notwithstanding this

lack of a record and the absence of a motion in limine or appropriate and/or timely objection to this testimony, the majority opinion concludes that to admit such expert testimony was error. Based on some general concerns about the helpfulness of the ten criteria that was developed by the gang strike task force and because the expert's testimony "was, for the most part, duplicative" of other testimony, the majority opinion concludes that this testimony was of "little real assistance to the jury in evaluating the evidence." The majority further adds that the jury did not need extensive expert assistance to enlighten them as indicia of gang membership and that expert testimony was neither helpful nor meaningful. I agree that "first-hand knowledge testimony is how the state can and should go about proving the essential elements of this crime," but that is not necessarily the best or only way to do so. Expert testimony may be helpful or necessary in this type of case. The majority may be opening the door to more gang-related *Spreigl*-type evidence in the process. Finally, the majority, notwithstanding its concerns, concludes that this error "was harmless because, in light of the other witnesses' testimony, there was no reasonable possibility that Jenkins' testimony substantially influenced the guilty verdict." Although no record had been presented to sustain any constitutional challenge to this statute or this evidence, the majority makes a policy-based ruling that may effectively exclude expert testimony on gangs.

The appellant in this case was charged with a crime that benefited the "Black Gangsters," also known as the "New Breed Disciples," the "Breed," the "New Breed," or the "Trey Ls." Now, even though there was no constitutional basis to challenge this statute or this testimony in this record, the majority excludes it on an evidentiary basis, which typically rests within the sound discretion of the district court and which we do not reverse absent clear error. *State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995).

There is nothing in the record to indicate that the use of this testimony was "clear error." The majority opinion rejects this testimony on a lower standard than we have ever used in this type of analysis by holding that its admission was "error." There was nothing clear about the error and there is no factual record that challenges the reliability and validity of both the data and the data analysis presented by this expert. Without declaring Minn.Stat. § 299A.64, subd. 2(b) (2002) unconstitutional, the majority has rendered this statute meaningless. Although the majority finds the error harmless in this case because the expert's testimony was largely duplicative, the majority does not cite one case in Minnesota where we have held that it is a clear abuse of discretion for the district court to allow the introduction of cumulative evidence into the record or explain why cumulative evidence leads to a clear abuse of discretion. Minnesota Rules of Evidence 702 generally allows expert testimony if it will assist the jury in resolving factual questions presented. *State v. Grecinger,* 569 N.W.2d 189, 195 (Minn.1997).

The fact that media coverage is replete with sensational stories of gang violence, both real and fictionalized through numerous televised sequences, makes the testimony of a reliable expert all the more essential. It not only adds precision and depth to a jury's understanding of the way in which gangs actually operate, but it also removes some of the sensationalism and fiction that television viewers are constantly bombarded with. There is nothing in this record to establish that this expert testimony was "irrelevant, confusing or otherwise unhelpful." *State v. Miles,* 585

N.W.2d 368, 371 (Minn.1998). Further, the majority fails to cite a single case where a court has concluded that expert gang testimony, although relevant, was otherwise inadmissible based on a conclusion that the jurors are sufficiently knowledgeable about the operation and characteristics of gangs such that an expert's opinion would not be helpful and therefore inadmissible.[2] The majority's analysis is flawed in that it improperly conflates the determination that the expert's testimony would not be helpful with the discussion relating to the possible cumulative nature of some aspects of this testimony. It is also unclear which part of Officer Jenkins' testimony was admitted in clear error. The majority bolsters its arguments with a lengthy footnote citing a number of commentaries that were not part of the record or developed in the district court. This type of information should not be injected at this late stage in the proceedings to justify an otherwise untenable position. The majority also adds an unjustifiable caveat that characterizes this case as a "noncomplex drug conspiracy case." Such labeling does nothing to advance the majority's analysis and creates a new distinction among drug cases that will only cause confusion in the district courts as those courts attempt to apply the new rule of law on experts embodied in the majority's decision.

Contrary to what the majority implies, most of Jenkins' testimony was never objected to at trial. There were six hearsay objections. The first objection was responded to by a rephrasing of the question with no follow-up objection. There was also one foundation objection, which led to the court instructing counsel to provide additional foundation. This additional foundation was provided and there was no follow-up objection. Two additional foundation objections were made and overruled: one question related to the general nature of this particular gang and the other was "how does a person typically rank within inside a gang?" There was also an objection to nonresponsive testimony as being beyond the scope of the question, which was overruled, and a hearsay objection concerning the general nature of this particular gang. Other than that, Jenkins' testimony came into the record without objection.

Similarly, the introduction of a number of gang-related exhibits were offered by the state and received in the record for illustrative purposes. Defense counsel specifically stated on the record that he had no objection to their introduction. These exhibits include Exhibit 9, which "outline[d] the Black Gangsters or New Breed Disciples; their representative symbols, their representative colors, and their general al[l]iance, whether folk or people." Exhibit 10, which was "a copy of our State Gang Planner System, or State Gang Criteria System"—a list of the ten criteria that were used to objectively analyze and document gang membership. Finally, there were Exhibits 11, 12 and 13, introduced as a group, which were "charts documenting the ten-point criteria with the individual names of the parties that I just mentioned." Any objection to this testimony was indisputably waived. After all of this evidence was in at the end of the testimony, defense counsel did state that he has one "continuing ongoing objection to this entire line of testimony." This

---

2. Interestingly, in the only federal district court case quoted by the majority as persuasive authority to support its holding, the court held permissible expert gang testimony relating to both the defendant's gang membership and the manner in which the defendant's gang resolved disputes between members. *United States v. Lombardozzi*, 2003 WL 1907965 at *4, —— F.Supp.2d —— (S.D.N.Y. April 17, 2003).

came in the record after 33 pages of trial testimony and receipt of the five exhibits identified above. A belated objection such as this has never before been used to create a basis to analyze otherwise unobjected—to testimony already in the record. The two foundation objections that were made relating to a particular gang and the way one gets ranked within a gang should not be used by the majority to expand the objection to encompass everything else that this officer testified to. A continuing objection after the fact and after the evidence in the record can be a clever ploy to cover up possible mistakes by defense counsel, or an attempt to creatively expand the scope of the previous specific and limited objections. However, this court should not fall for such a ploy. We should base our decision on the record and by following precedent.

The majority also takes issue with the testimony of Officer Jenkins concerning the "whole myriad of different crimes" that street gangs were involved with. However, this testimony was also introduced into the record without any objection, as was the testimony concerning the division of gangs into a "people nation and a folk nation." The majority does mention that "the district court overruled seven objections defense counsel made," which is true but is only part of the story. The majority omits discussing the rehabilitative questioning that occurred in response, the lack of objection thereafter, and the limited nature of the two foundation objections.

Based on this record and the fact that gang and gang-related activities are an essential element of the state's proof beyond a reasonable doubt, I would affirm the court of appeal's analysis and allow such testimony.